**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ADELE E. RUPPE )<br>1355 Maryland Avenue, N.E. )<br>Washington D.C., 20002, )<br>  )<br>  Plaintiff, )<br>v. )<br>  )<br>REX W. TILLERSON, )<br>Secretary of State )<br>U.S. Department of State )<br>2001 C Street, NW )<br>Washington, D.C. 20520, )<br>  )<br>  Defendant. )<br><u>Serve</u>: )<br>U.S. Department of State )<br>The Executive Office )<br>Office of the Legal Adviser, SA-17 )<br>Attention: Alicia Frechette, )<br>Executive Director )<br>600 19th Street, NW )<br>Suite 5.600 )<br><u>Washington, D.C. 20522          </u>) | Case No.:<br><br><br><br><br>JURY TRIAL DEMAND |

**<u>COMPLAINT</u>**

**NATURE OF ACTION**

1.     This is an employment action for Discrimination based on Gender (Female) and Disability Status (Perceived Disability), and for Retaliation, Reprisal and creation of a Hostile Work Environment, arising out of Plaintiff's employment with Department of State (herein, "State" or "Agency") in the Foreign Service, where, at the time giving rise to these allegations, as she worked as Director of the Office of Public Diplomacy, in in the Bureau of European and Eurasian Affairs.

2.     As part of the discriminatory conduct in question, the Plaintiff Adele Ruppe (herein referred to as "Ruppe" or "Plaintiff"), alleges that the Agency engaged in gender discrimination and retaliation and reprisal when it failed to select her for promotional opportunities. Ruppe contends she had previously apprised her Agency of a widespread problem of supervisory "bullying" of women in her section of the Agency at the time these decisions were made, and that she had described these with sufficient detail to allege that gender discrimination was occurring. Plaintiff alleges that, though she was substantially more qualified than the selectees for certain positions to which she was applying, the State Department failed to promote her to more prestigious and career enhancing management position of Deputy Chief of Mission.[1] This denial was based on the hostility of her immediate supervisor Benjamin Ziff (herein referred to as "Ziff"), who displayed direct, sexist attitudes toward Ruppe. Ziff compounded his hostility toward Ruppe by showing an unreasonable and inappropriate amount of attentiveness to a female subordinate in the section, at the expense of Ruppe, and other females in the section.

3.     Ruppe further alleges that advancement opportunities, followed her reports of these issues and of other concerns over the treatment of female staff.  Thus, she contends her non-selections were also based on retaliation for her reporting a possible form of sexual harassment.

4.     The Agency also applied gender based stereotypes to Ruppe. Despite an exemplary performance record, her supervisor repeatedly demeaned her in her person and performance, by claiming she was a "micro-manager" who displayed "passive-aggressive" tendencies, and needed emotional and professional counselling.

5.     When Ruppe applied for advancement positions, she was advised by her second level supervisor, that while she was highly qualified, there were discussions about her intra-

---

[1] A DCM position is a pre-requisite to being considered for a "Career Ambassador" position or a Deputy Assistant Secretary Position.

personal style that tracked the derogatory and sexist comments of her immediate supervisor. Other applicants, substantially less qualified than Ruppe were selected for DCM positions in which she expressed interest.

6.     Ruppe further complains that following her complaints to her supervisors and to Human Resources, in addition to being denied DCM positions, her immediate supervisor, excluded her from meetings, and isolated and segregated her in the workplace. Ruppe had already complained that her supervisor had displayed an inappropriate level of attention to a female employee, who was her junior and was already dismissive of her, but after her reporting these conditions worsened.

7.     She also alleges that the Agency violated the Equal Pay Act of 1963, 29 U.S.C. § 206(d), by paying her substantially less than males who were performing work of substantially equal skill, effort and responsibility. While the Agency has contended that pay is based on an ill-defined "rank-in-person" system, an alleged objective base pay system, the reality is that Ruppe, as a female, is being paid substantially less for the same work performed by men at an equal skill, effort and responsibility level. Ruppe believes that comparators will yield that women in the Foreign Service are routinely being paid less than their male counterparts, while performing equal levels of work to the men. This she contends violates the tenants of the Equal Pay Act.[2]

8.     The supervisory comments that attacked Ruppe's mental health, also violated the Rehabilitation Act of 1973. Ruppe alleges Benjamin Ziff perceived her as disabled, that is he saw

---

[2] In its EEO investigation, the Agency failed to adequately review this claim, claimed no comparators were available and failed to apply any standard other than a Human Resources employee's statement to rebut evidence of a violation of the Equal Pay Act. At the same time, however, the Agency acknowledged that Ruppe was likely being paid substantially less than her male counterparts.

here as emotionally unsuited for senior management because he perceived her to suffer from impairments, when none existed.

9.      Finally, Ruppe points out that Ziff also linked her discussion of Ruppe's career to comments about Ruppe's husband's geographical location and the perceived paramount necessity to Ruppe to work near where he lived. These comments were also part of a sexually discriminatory work environment that harmed Ruppe in her promotional track.

10.     Plaintiff has fully exhausted the administrative phase of her case pursuant to 29 CFR 1614.101 *et seq.* The Agency issued a Final Agency Decision ("FAD") on September 29, 2017. This complaint is therefore timely filed in the U.S. District Court where the harm alleged occurred.

## PARTIES

11.     <u>Plaintiff</u>: Adele E. Ruppe was, and is at all times relevant to this Complaint, a resident of the District of Columbia and a federal employee, employed by the U.S. Department of State, at the main office of the State Department, which is located at 2201 C Street NW in the District of Columbia.

12.     <u>Defendant</u>: Rex W. Tillerson ("Tillerson" or "Defendant") is the current Secretary of State for the U.S. State Department (herein referred to collectively the "Agency").

13.     Defendant Tillerson is being sued in his official capacity of the Secretary of State. On information and belief, Tillerson is a nominal defendant only who, pursuant to Title VII and the Equal Pay Act, must be named as a party defendant.  It is not believed at this time that Tillerson has any personal knowledge of, or engaged in any discriminatory conduct toward, Ruppe. The true actors at issue are named in the Complaint below.

## JURISDICTION AND VENUE

14.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1343, and 1346 as this action involves federal questions regarding the deprivation of Ms. Ruppe's rights under Title VII of the Civil Rights Act, 42 U.S.C. 2000e; Equal Pay Act of 1963, 29 U.S.C. § 206(d); and the Rehabilitation Act of 1973, 29 U.S.C. 701.

15.     Venue is proper in the District of Columbia pursuant to 28 U.S.C. § 1391 because Plaintiff was employed by the Agency in the District of Columbia and the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## FACTS

### A.  Ruppe's Employment History as a Foreign Service Officer

16.     Adele Ruppe joined the U.S. Department of State on January 4, 1993. Ruppe was initially assigned to duties in Costa Rica as a Junior Officer trainee and in Mexico as an Assistant Cultural Affairs Officer.

17.     From 1993 to 2005, Ruppe served as a Public Diplomacy Officer working in Madrid, Moscow, Mexico City, and San Jose.

18.     In 1996, Ruppe took a Russian language class until 1997, when she began a tour as an Assistant Information Officer in Moscow until 1999.

19.     From 2000 to 2003, Ruppe served as the Assistant Cultural Affairs Officer in Spain.

20.     Ruppe returned to Washington, D.C. in 2003, where she served as a Trade and Policy Officer, in the Bureau of European Affairs' Public Diplomacy Office.

21.     Ruppe served as a Special Assistant until 2007, when she began working towards her Masters Degree in National Security Strategy, which she received in 2008 from the National War College.

22.     Ruppe then served as a Public Affairs Counselor in Brazil until 2011, when she was selected for a Deputy Minister Counselor position in India.

23.     From 2014 to 2017, during the acts that gave rise to this action, Ruppe worked as the Director in the Public Diplomacy Section of the Bureau of European and Eurasian Affairs.

24.     The Foreign Service in which Ruppe is employed is a personnel system, created by Congress in 1924, whose mission is to provide consular and diplomatic services for the United States.

25.     The Foreign Service is housed within the Department of State and is tasked with carrying out the foreign policy of the United States and aiding American citizens abroad.

26.     The Foreign Service is managed by a Director General, but is its own entity within the State Department and thus, the Secretary of State is ultimately the head of the Agency, including for purposes of bringing a lawsuit against the Agency.

27.     The Senior Foreign Service was created by an Act of Congress in 1980 as part of an overall personnel reform of the Foreign Service itself. *See* 22 U.S.C. § 3903 *et seq.*

28.     The Foreign Service is an excepted service. Its personnel rules are not covered directly by the Merit System Principles, but instead by statute and policy. Such principles apply to all personnel actions, including promotions.

29.     Pursuant to 22 U.S.C. § 3905, all personnel actions in the Foreign Service are subject to the same Merit System Principles as the federal civil service. By statute, this specifically includes any appointment, promotion, assignment (including assignment to any position or salary

class), award of Performance Pay or special differential, within-class salary increase, separation, or performance evaluation, and any decision, recommendation, examination, or ranking provided for under this chapter. *See* 22 U.S.C. §§ 3905(a)(2)(A), (B) (which relates to any action referred to in subparagraph (A)).

30.     In addition, the Foreign Service is to be free from discrimination, retaliation or reprisal for making protected disclosures of claims of discrimination on the basis of race, color, religion, sex, national origin, age, handicapping condition, marital status, geographic or educational affiliation within the United States, or political affiliation, as prohibited under 5 U.S.C. § 2302(b)(1) or disclosures of any violation of law, rule or regulation, or those made to the Office of Special Counsel, the Inspector General or the Merit Systems Protection Board. *See* §§ 3905(b)(2)(A); (B)(3)-(B)(4).

31.     Foreign Service pay is set forth under the Foreign Service Schedule, which consists of nine (9) classes, ranked one (1), most junior, to nine (9), most senior.  There are fourteen (14) steps that apply to each of those grades.

32.     The Executive Schedule has five grades, EX-1 to EX-5, with EX-5 being the highest. The highest grade in the Senior Foreign Service has an annual salary cap of $207,000.

33.     The Senior Foreign Service ("SFS") has a pay band between $124,406 and $187,000.

34.     Different locations have different locality pay calculations.

35.     SFS ranks include Counselor ("OC") capped at $175,542; Minister Counselor ("MC") capped at $184,147; and Career Minister ("CM") capped at 187,000.

36.     The Senior most level of the SFS is a Career Ambassador.

37.     The Senior Foreign Service (SFS), is the senior managing component of the Foreign Service.

38.     Women have faced substantial barriers at the State Department. They have been subjected to sexual harassment, which has seldom been properly disciplined. *See* April 2016's Office of Inspector General Report on Inspection of the Bureau of Human Resources and European Journal of American Studies 2015 report detailing sex discrimination and harassment issues in the Foreign Service.

39.     The Foreign Service has five (5) separate career tracks or "cones"- Consular Officers, Economic Officers, Management Officers, Political Officers, and Public Diplomacy Officers, each of which perform different functions within the Department of State.

40.     On information and belief, females are slotted into the Public Diplomacy section at disproportionate rates.

41.     The Agency has repeatedly acknowledged that women are underrepresented in its senior foreign service and management ranks.

42.     On information and belief, this is particularly true of Deputy Chief of Mission ("DCM") positions overseas in Europe and other key areas of assignment.

43.     In 2011, Ruppe was promoted into the SFS with the rank of FE-OC and a salary of $146,018.

44.     She was promoted to the FE-MC rank on February 15, 2014, with a salary of $147,843.

45.     On January 5, 2016, Ruppe was approved for a Superior Honor Award for exceptional performance.  Although the award carries a monetary value of $2,000 or more, since

2014, Ruppe's only salary increases have been made by way of locality pay adjustments for the Washington, D.C. area.

46.     Ruppe's current grade within the Foreign Service is that of a Minister Counselor.

47.     Ruppe serves in the Public Diplomacy Cone of the Foreign Service.

48.     According to the State Department's web site, Public Diplomacy Officers promote U.S. interests abroad, manage cultural and information programs, coordinate exchange programs and strengthen relationships to improve foreign insight into American society.

49.     At a senior level such as Ruppe's, Public Diplomacy officers manage regional or global exchange programs, represent embassies overseas, are responsible for staffing and budgeting issues, and advise the Agency and its senior personnel about the media, cultural or educational climate of a country.

50.     In this capacity, senior Public Diplomacy Officers become highly knowledgeable of the particular countries and regions to which they are assigned.

51.     As part of the Career Progression in the State Department, SFS personnel vie to become the Deputy Chiefs of Mission ("DCM") at a foreign post.

52.     The DCM serves as the second in command and chief operating officer at an embassy. The DCM is also the person who takes over as "chargé d'affaires" when the ambassador is out of the country. DCMs typically take the leadership in building embassy teamwork through fostering maximum communication and cooperation between the various sections. A DCM is called on to understand the overall U.S. diplomatic mission where they serve but also the specific concerns of every element within the mission. The DCM also largely manages embassy operations. The position is all but a necessary pre-requisite to Career Ambassador positions. As such, the positions are highly sought after.

53.     The positions also include added pay and benefits and can lead to the higher salaries of the Agency.

54.     Throughout Ruppe's career, she has consistently received the highest possible level of performance reviews. She has received numerous awards, including the highly coveted Superior Honor Award.

55.     Her performance ratings establish that she is eminently qualified for senior most positions in the Agency.

56.     Ruppe's recent performance yearly ratings are filled with comments lauding her skills and abilities.

57.     From 2006 to 2015, records of Ruppe's performance in the Agency reveal an outstanding Foreign Service Officer of impeccable skill, who combined targeted leadership, knowledge of subject matter and an ever-growing skill set to excel in the Agency.

58.     In her 2015 rating, Ruppe's supervisors stated, *inter alia,* that she had "reshaped and re-invigorated our public diplomacy engagement on every one of our frontline foreign policy challenges" (Performance Evaluation Section VIII).   Further, Ruppe was praised for her "leadership and mentoring of largely inexperienced team."   She received high marks for responding swiftly to the crisis in the Ukraine and on addressing the Kremlin's all-out war on information."[3]

---

[3] The crisis in the Ukraine referenced involved the suspected Russian involvement in supporting separatists in the Eastern Ukraine who sought to overthrow the newly formed pro-Western government.  The reference to the Russian war on information, involves the Kremlin's manipulation and abuse of social media and its application of computer hacking to interfere with sovereign states. As national headlines illustrate, Ruppe's knowledge of these areas was truly prophetic.

59.     Her supervisors also noted that "Adele brings an unparalleled substantive and institutional knowledge of the department's public policy operations to every challenge.  Not only does she know how to connect public diplomacy to policy, she can make it happen."

60.     Ruppe was also complimented for "a remarkable job in mentoring her team," which was described as relatively inexperienced and in need of assistance.

61.     In 2015, Ruppe was approved for Performance Pay, due to her extraordinary efforts and skills.

62.     In approving her for Performance Pay, Ruppe was noted as "a leader who delivers." *Id.*,   at Section IX.  This was because Ruppe delivered a "rare trifecta: overhauling a stultified office, strengthening our public diplomacy and architecture across the bureau, and pioneering a strategy to counter an unprecedented threat to the integrity of Europe's information space."

63.     Ruppe's relationship with her supervisors was considered to be "excellent." She was noted to have brought "our public diplomacy operation, sometimes kicking and screaming, into the future."

64.     Despite being approved for Performance Pay, Ruppe has never received any such pay.

65.     Ruppe believes her new supervisor, Benjamin Ziff, and others to whom she reported misconduct, conspired to deny her such pay.

66.     She further believes women received fewer Performance Pay awards than other similarly situated men in the Agency at the same levels of responsibility, even where the women provided superior effort to the men.

67.     The award of Performance Pay is a tangible and material benefit of employment.

68.     The denial may have been based on discriminatory animus and on retaliation and reprisal for protected activity.

## B. Ruppe's Career Trajectory changes after she reports to Benjamin Ziff

69.     For the 2016 rating period, Ruppe's supervisor changed to Benjamin Ziff. Although Ziff's comments lacked some of the zeal of his predecessor, Ziff initially spoke highly of Ruppe.

70.     Ziff commended that Ruppe was "a leader" in assessing the threat that Russian disinformation campaigns, who led "an understaffed team to shore up European support for targeted sanctions on Russia." U.S. Foreign Service Employee Evaluation of Adele Ruppe, 2016, Section VII.

71.     Ziff noted that Ruppe helped stand up a team investigating Russian involvement in the Ukraine and noted that her strategy "contributed to the renewal of the Ukraine sanctions regime- a key (Obama) Administration goal."

72.     Ziff commented that Ruppe had been at the center of the Agency's most pressing policy issues when dealing with Russia, including manipulation of social media, Russian disinformation as it related to the invasion of Ukraine and Russian abuse of information to interfere with European political systems.

73.     Ziff also noted that Ruppe had been adept at expanding her role in European affairs to address new challenges such as the British Exit from the European Union (AKA "Brexit"), mass migration to Europe. Ziff noted that "Adele's efforts should pay fat dividends as she applies out public diplomacy toolkit to contain renewed Russian aggression, address migration challenges, cope with the possible British exist from Europe, and influence the myriad other centrifugal forces that threaten our alliance with Europe." *Id.*

74.     Victoria Nuland, the ultimate reviewer, noted that Ruppe had overseen a $225 million-dollar budget involving a 700-person public diplomacy operation through a "major transition."  Nuland highly lauded Ruppe's skills. *Id.*, at Section VIII.

75.     Ziff's review displayed sexist traits that minimized Ruppe's skills, and which would assist in melding the tapestry of the hostile work environment she faced.

76.     Unlike the prior year's rating from Mark Toner, Ziff often regulated Ruppe to supporting his achievements.

77.     He also included the statement that noted that while Ruppe had "broad and deep public diplomacy experience, a keen understanding of interagency equities and a strong mission focus." It also chided her, ironically for the same skills that had brought the office to life a year earlier. Ziff stated: "Her way might be the right way, but on occasion she holds too tight to the steering wheel. We've discussed this and Adele is working on stepping back and allowing others to develop ownership."

78.     Ziff's comments were untrue. Ruppe was not counselled on "holding too tight to the steering wheel", to paraphrase Ziff, nor did he ever request she "allow others to take ownership", as Ziff so vaguely stated.

79.     The comments were also indicative of attitudes based on sexual stereotypes.

80.     By all estimates, Ruppe had trained an undermanned, uninspired team, with fixed ideas to address the existential threat of the Russian Federation as it exploited technology to dissemble and interfere with European interests. Her actions addressed Russia's high level of electronically based propaganda and its thinly veiled invasion of the Ukraine.

81.     Whereas Ruppe was lauded for her aggressive efforts to revamp the mindset of her department to face perhaps the most paramount policy threat of the last decade, Ziff critiqued her for the same skills that made this possible.

82.     Implicit in this criticism was the sense that Ziff saw Ruppe as overly controlling of staff and not willing to share efforts and credit. Ziff's evaluation supports that her saw her as a "micro-manager" who somehow was too intense in her focus.

83.     Though citing no staff complaints of any kind, Ziff conjured up a convenient prejudice, that an action oriented female is too aggressive and self-directed and that she should just calm down and be a team player.[4]

84.     Ziff's comments also stand in contrast to Ruppe's history in the Agency. Ruppe was and is an outstanding performer, who promoted through the ranks and took difficult assignments involving countries of key interest to U.S. foreign policy. Ruppe has an unblemished career, with no record of discipline or performance deficiencies.

## C.  Ziff attacks Ruppe for Engaging in Protected Activity

85.     What undoubtedly lay at Ziff's displeasure was the manner in which Ruppe had protested sexism and sexual favoritism in the workplace, including that engaged in by Ziff.

86.     In July 2015, Ruppe advised her second lesson supervisor, Jon Heffern ("Heffern") that she was aware of complaints from certain female Foreign Service Officers that they had been bullied by two male deputies that had been in her section. She informed Heffern that she had

---

[4] The Gordian knot, for women as managers, is how to assert authority without seeming too harsh and "demanding." Of course, if a woman fails to act forcefully she is believed to be too passive. Ziff's comment would be in line with a view of Ruppe as "passive-aggressive" and a "micro-manager." As noted below, the Agency has admitted it "needs to do more" to promote diversity in its workforce and management selection practices. Despite this professed goal, the evaluations of women for management positions establish that men are graded on their perceived strength as leaders, while women are often chided on their interpersonal skills.

reported these matters to the Agency Ombudsman and had advised the Ombudsman that the women felt intimidated and threatened based on comments from their male superiors.

87.     Heffern supervises Ziff in his positions as Principal Deputy Assistant Secretary.

88.     One month later, in August 2015, Ruppe advised her new supervisor, Benjamin Ziff, that the section had had problems with male supervisors bullying women at the deputy level. She advised him that the work environment had become so bad that she had brought it to the attention of her superiors, the Ombudsman, and the Human Resources Department.

89.     Specifically, Ruppe informed Ziff that he had spoken to Heather Townsend ("Townsend"), a Human Resources Officer, about the harassment of women by the male deputies. Ruppe specifically told Townsend that she believed that women were being mistreated by male superiors. Ruppe stated that she thought sexism lay at the core of the mistreatment.

90.     Although the complaints should have been referred by Townsend, on her own right, to the EEO office, Townsend did not advise Ruppe to bring her concerns there. Instead, Townsend suggested Ruppe do request an anonymous "climate survey" that would purportedly investigate these issues.

91.     On September 18, 2015, Ruppe reported to the Ombudsman's office that she had had a conversation with Ziff in which she believed that Ziff had tried to preclude her pursuing the climate survey. The Agency took no action on Ruppe's concerns.

92.     As the Ziff inspired performance rating of 2016 occurred in May 2016,[5] there is a temporal nexus between the reporting of the sexually harassing work environment faced by subordinates to Ziff and Ziff's reduced view of Ruppe.

---

[5] Ziff contends that counselling sessions were held in September 2015 and January 2016 as part of the normal course of supervisory review. In the investigative stage, the Agency turned over no documentary evidence from either of those sessions.

**D.  Ziff's Sexism continues a Hostile Work Environment**

93.     Ruppe faced several other instances where Ziff helped create a hostile work environment.

94.     When discussing Ruppe's efforts to seek DCM positions, discussed below, Ziff interjected, with no prompting from Ruppe, that she might want to seek a position in Washington, D.C., so she could stay close to her husband. He discouraged Ruppe on her ability to secure a DCM slot, by being evasive about the status of her submissions and his knowledge and support of her applications.

95.     Ruppe learned that while he was cavalier on her efforts, Ziff had been actively seeking to advance and promote a female civil service employee,[6] in whom he seemed to express an excessive amount of interest, to the point that Ruppe was receiving complaints from female staffers that Ziff was acting inappropriately.

96.     Ruppe also witnessed this herself, watching Ziff speak to the employee in Italian and spend an inordinate amount of time and attention on that employee, while at the same time denigrating and ostracizing Ruppe.

97.     When Ziff would criticize Ruppe, he often did so in front of her subordinates. Lillian DeValcourt-Ayala detailed in her affidavit, in the administrative phase of the case, how Ziff critiqued Ruppe's management style before subordinates beginning in late 2015 and continuing through at least May 2016.

98.     Ruppe also was denied Performance Pay and, on information and belief, believes her management was responsible for that denial.

---

[6] For purposes of the complaint, which is public record, Ruppe is not disclosing the identity of the female employee, who is fully identified in the administrative action below. Ruppe is mindful of not attacking the object of the sexist attention at this stage of the proceedings.

99.     At the same time, Ruppe believes that Ziff sought to obtain a monetary award for the female civil servant whom he favored in the office.

100.     This double standard reinforced Ruppe's belief that Ziff was favoring a woman whom he found physically attractive over other women in the office, including Ruppe.

101.     As part of her raising complaints of a sexist work environment, Ruppe had expressed her concern over this seemingly personalized relationship to Agency personnel in Human Resources *before* meeting with Ziff for a mandatory performance counselling session.

102.     Employees who worked with Ruppe confirmed that she had expressed concerns over Ziff's treatment of her and his favoritism to the female civil servant, at the time these incidents occurred.

103.     The Human Resources Section acknowledged that Ruppe had complained to them, but attempted to minimize the complaint as one of mere disagreement over managerial style.

104.     The defense appears to have been created after Ruppe filed her EEO complaint in November of 2016. Indeed, a review of the affidavits provided by Agency senior personnel appear to craft similar language that was, and is designed to claim that Ruppe, while raising complaints, did not clearly express them as sexual harassment- something she disputes.

105.     The statements suggest managerial and Agency collusion, in an effort to shield the Agency from its responsibility to deter sexual harassment and protect those who report it, including Ruppe.

**E.  Ziff attacks Ruppe's Mental Health, compounding his Sexism with an Improper Medical Evaluation that Perceived Ruppe as Suffering a Disability**

106.     At the September 2015 counselling session, Ziff informed Ruppe that while she was a capable Foreign Service Officer, she was too emotional and personal in her outlook. He apprised Ruppe that she was "paranoid and believed everyone was against her."

107.     As an example of this paranoia, Ziff specifically cited Ruppe's discussion with him regarding the deputies who she had reported for sexual harassment and bullying.

108.     Ruppe strongly believes that Ziff's perception was conveyed to senior management and doomed her chances for promotion.

109.     Ziff has, on information and belief, no medical training of any kind and is not a licenses practitioner of the healing arts, in the fields of medicine, psychology, psychiatry or social work.

110.     His demeaning comments to Ruppe, undermined her standing in the Agency and her own self-worth and caused severe emotional distress.

111.     They also served as further evidence of Ziff's attempts to manipulate and denigrate Ruppe, through personal attacks on her perceived mental health and emotional maturity.

112.     The attacks were sexist in nature, focusing on the seemingly controlling, paranoid and hysterical nature of Ruppe, rather than on her competence and managerial ability.

113.     Such attacks are classic expressions of "gaslighting,"[7] that is disorienting the victim of an attack by challenging their perception of reality.

114.     Further, even independent of that, the panel comments from the only two of the several positions for which Ruppe did apply, tended to grade men on their experience and knowledge and women primarily on their personal skills.

---

[7] The term refers to the treatment of Ingmar Bergman in the 1944 film Gas Light, where her husband attempts to convince her that she is insane in a concerted effort to have her committed to a mental institution, and to allow him to pursue, unencumbered, the search for precious jewels left for Bergman by her relative. The plan is unmasked when a detective speaking to Bergman, confirms that the gas light in the living room has dimmed. Gaslighting today is a form of manipulation that seeks to sow seeds of doubt in a targeted individual or in members of a targeted group, hoping to make them question their own memory, perception, and sanity. Using persistent denial, misdirection, contradiction, and lying, it attempts to destabilize the target and delegitimize the target's belief.

115.    In Ruppe's case, although she was lauded for having reshaped a lethargic department, she was undermined apparently because "two subordinates" expressed displeasure with her manners.

116.    By December 2015, Ruppe was being actively discouraged from pursuing allegations of a sexually harassing and hostile work environment. Ziff informed her that she should not be speaking to desk officers regarding their complaints and instead she was instructed to "sit in your office and don't do anything." With respect to the desk officers who had complained to her, Ziff told Ruppe she should be "unapproachable."

**F.  Ruppe's Non-Selections**

117.    While women have been promoted faster in the public diplomacy sector than their male peers in other sections, fewer of them have been promoted overall.  This is particularly true when it comes to DCM positions.

118.    Public Diplomacy FSOs, who are predominantly women, are promoted in fewer numbers than their male counterparts in the political cone.

119.    The result is that there are far fewer managers at the Agency in the mid and upper grades of the Agency than there are males and they are paid substantially less for performing the same levels of work.

120.    DCM assignments in the Foreign Service favor men. On information and belief, certain posts in certain countries, such as Bulgaria, to which Ruppe applied are "male posts." Women are not selected for such positions.

121.    This pattern was followed in Ruppe's situation.

122.     In April 2016, Ruppe had informed Heffern that she wanted to discuss bidding for DCM positions that could enhance her career and her trajectory into the more senior ranks of the SFS.

123.     In May 2016, Ruppe met with Heffern and was informed by him that she had an excellent chance for selection given her ample qualifications. Ruppe and Heffern specifically reviewed positions as DCM Vienna and positions of senior rank in Sofia and Sarajevo.  Heffern informed Ruppe that a selection for Vienna was already being advanced. He advised her he thought her Russian skill set would be better suited for Sofia and assured her she would make the "short list" of candidates for that position.

124.     On July 8, 2016, Heffern confirmed that the selection panel "has her down" for the DCM Sofia.

125.     During this conversation with Heffern, Ruppe discussed Ziff's apparent pre-occupation with a female employee civil servant, who she mentions by name. She advises Heffern the matter has become a morale issue for the women in the section. She informs Heffern that Ziff is undermining women in the office by communicating only with the apparent object of his affection. Ruppe reports the names of the women who have complained.

126.     Ruppe notes that the favored female employee was openly discussing how Ziff favored her, which was further undermining morale.[8]

127.     On August 4, 2016, Ruppe was interviewed for the Sofia DCM position. She was advised she was among the top candidates. In that interview, she was also asked about her application for the position in Sarajevo, which is part of the Bosnia-Herzegovina Ambassadorship.

---

[8] Ruppe was unaware from any agency training that favoring one female over others in a work environment based on sex based considerations such as physical appearance is a form of hostile work environment.

128.     On August 17, 2016, Ruppe received a laudatory electronic mail communication from Ambassador Eric Rubin, who oversaw the then Obama Administration's mission in Bulgaria. Rubin advised Ruppe that he anticipated seeing her on the short list for selection to a Bulgarian post and informed her "I know and admire your work enormously." Rubin stated that once he saw Ruppe on the "short list", he would speak to the selection panel about her.

129.     Ruppe did not make the short list, despite former assurances. Instead she was advised that she would not be selected, because the selection panel had received "informal" responses that appeared to directly relate to her complaints against former deputies who she believed harassed women.

130.     Ruppe also suspected that her conversations with Heffern about Ziff and Ziff's harsh treatment of her had played a role in her non-selection.

131.     On October 11, 2016, Ruppe became aware through a communication from her Career Development Officer that she had not been selected for any DCM positions in Sofia.

132.     On November 29, 2016, Ruppe was notified she was not selected for DCM positions in Astana and Tashkent.

## G.  Ruppe was Substantially More Qualified than the Selectee for the DCM Positions to which she Applied.

133.     The Agency has not supplied comparators on most of the DCM positions to which Ruppe applied.

134.     What the Agency has supplied in redacted and sanitized comparators does, however, establish that Ruppe was more qualified than the selectee.

135.     With respect to the selection for the position in Sofia, Ruppe was substantially more qualified.

136.    The State Department selected Justin Friedman for the position.

137.    Comparing Ruppe's experience to Freidman's she had greater supervisory experience. Ruppe supervised a larger number of personnel than Friedman.

138.    Ruppe oversaw the work of more than 700 public diplomacy personnel. She managed a budget of nearly $200,000,000.

139.    Ruppe dealt with missions in larger and more significant nations than the selectee. She worked in Brazil and India while the selectee dealt with the country of Brunei, a nation of substantially less geo-political significance than the selectee.

140.    Ruppe also had extensive experience in Eastern European and Russian affairs, both of which are high priority areas of concern for the State Department. She also worked on issues impacting members of the North Atlantic Treaty Organization (NATO).

141.    Given the above, Ruppe had more significant supervisory experience than the selectee and thus should have been chosen for the position.

142.    With Heffern and Ziff aware of Ruppe's prior complaints, there was clearly an understanding that she engaged in protected activity by supporting persons claiming of mistreatment based on sex.

143.    Ruppe reported this to Human Resources and to an Agency Ombudsman, before the selection panel sat and stated that she was seeking to support the claimants and root out harassment based on sex.

144.    Heather Townsend confirmed that the selection panel was aware of Ruppe's "issues" with the former deputies.

145.    Townsend was also personally aware of the reporting herself and appears to have advised the selection committee.

146.    As Human Resources and the Ombudsman should have been aware of Agency EEO practice and are obliged to report and investigate such misconduct, they are logically connected to the Agency's EEO policies.

147.    The existence of prior protected activity by Ruppe, the knowledge of that activity by certain supervisors connected to her promotional activities means that the selection panel would have been influenced by these actions.

148.    The fact that the selection panel's only negative comments on Ruppe involved her supposed lack of skills in human resources, suggests that, as Ruppe suspected, her efforts to promote were doomed by comments from unidentified sources that were attacking her for her protected activity.

149.    As further evidence of this involvement, on September 21, 2016, Ruppe met with Ziff to discuss her applications for promotion to DCM positions. She specifically discussed, among other things, the applications he had made for DCM slots in Sofia and Sarajevo.

150.    When Ruppe applied for promotions in the late spring and summer of 2016, Ziff provided comments to the selection panel overseeing the assessment of Ruppe as a candidate.

151.    Although Ziff was vague on whether he made any specific comments, Heffern stated, in the administrative investigation of the case, that Ziff would have provided comments about Ruppe.

152.    Further, the selection panel notes claim that two former subordinates, who were never identified by the Agency, claimed she needed to improve her "human resources skills", a term also never elaborated on by the Agency.

153.    On information and belief, Ruppe believes these two employees may have been the personnel who she claimed had engaged in sexist acts against women.

154.     Additionally, the star chamber nature of the allegations and their lack of specificity as to what skills or conduct was even at issue, suggests the comments were pre-textual and an expression of discriminatory animus.

155.     Principal Deputy Assistant Secretary John Heffern was also involved with the selection panel that denied positions to Ruppe.

156.     Based on the above, Ruppe alleges that she was denied DCM positions based on gender discrimination and in retaliation and reprisal for protected activity. To the extent Ziff's allegation of perceived mental impairment was also communicated to the selection panel, she also alleges her non-selections violated the perceived disability prong of the Rehabilitation Act of 1973.

## H.  The Equal Pay Act Claim

157.     On information and belief, Ruppe is paid less than male counterparts in the Agency who serve in the ranks as a Career Minister.

158.     Ruppe is paid less, although she brings the same skill, and effort as those males to positions of nearly identical responsibility.

159.     In March 2016, Ruppe requested information concerning whether she was receiving pay commensurate with males at her grade and level of responsibility. To date, the Agency has refused to answer that simple question.

160.     Ruppe's current basic pay is $160,654.00 per annum. Her last pay increase was on January 8, 2017 when her pay was increased from $154,653.00 to her present salary.

161.     The way the State Department promotes employees disfavors women like Ruppe in salary calculations.

162.    The slower a person is promoted, the greater their salary is, once promoted. That is because the State Department appears to award longevity in grade for foreign service personnel in each subsequent promotion.

163.    Such a policy acts to the detriment of those who have traditionally been excluded from senior management, to wit: women such as Ruppe.

164.    In the administrative phase of the case, the Agency failed to address the disparate impact of its otherwise neutral policy, although Ruppe clearly raised it in the substance of her allegations.

165.    Ruppe contends that she has lost in excess of $25,000 per year since 2011 as a result of the lower pay she is receiving as compared to her male counterparts.

166.    She contends that receiving lower pay for the same work not only violates the Equal Pay act, it signals that she is deemed less experienced and competitive than her male counterparts.

167.    The Foreign Service is not on the General Schedule and uses a pay system unique to the State Department.

168.    Nevertheless, Merit Principles applicable to all federal employees, the Equal Pay Act and the Foreign Service Act, all require that persons performing the same type and grade of work be paid within the appropriate range. That is, they are to receive equal pay for equal types of work.

169.    Ruppe alleges upon information and belief that she and other females have been "coned" into Public Diplomacy and, through an odd application of the promotional system now, like herself, occupy positions substantially identical in skill, effort and responsibility.

170.     This coning policy contributes to the disparate pay women receive in the Agency and may itself violate anti-discrimination law, a point Ruppe raised in her administrative complaint.

171.     Ruppe complains that the way the State Department pays FSOs has resulted in a disparate impact on women.

172.     The State Department has traditionally been a male dominated institution, particularly in the Foreign Service ranks.

173.     Over the past decade, women such as Ruppe have been promoted, but because the current system adds a disproportionate salary differential for years of service within grades, it has the impact of providing those who were promoted faster in grade a lower salary.

174.     In other words, the system rewards longevity over talent, rewarding those who were promoted more slowly with higher pay for the same work they are performing with more exceptional employees who promoted more quickly.

175.     Since women were historically underrepresented in the Department, those that were promoted into senior and management ranks, invariably promoted faster than their male counterparts.

176.     As a result, Ruppe contends she receives less pay than her similarly situated male counterparts who perform substantially the same duties at the same level and grade.

177.     On information and belief, Ruppe believes other women also receive less pay than similarly situated male counterparts who perform substantially the same duties at the same level and grade.

178.     At the administrative phase of the case, the Agency, through Human Resource Specialist Jacqueline Jones Ridley, who the Agency presented as a subject matter experts,

confirmed that Ruppe entered management ranks as the lowest paid employee promoted into those ranks. Implicitly this meant that she was paid a lower salary than other similarly situated employees. Ridley response to Question 17, Affidavit of May 18, 2017, Agency Investigation DOS-0053-17.

179.    At the administrative phase of the investigation, the Agency refused to provide comparators for the salary of males performing the same types of work as Ruppe. Indeed, the Agency stated that "you can't compare salary or employees based on which assignments they serve in." Id., Ridley, Response to Question 17. The State Department has been the source of Congressional concern over its lack of promotional opportunities for women.

180.    The fact that the Agency refuses to produce comparators is not a defense to the claim of discrimination.

181.    A disparate impact may occur, where the policy at issue, while objectively neutral harms the protected class by its very application.

182.    Such a policy may also support a claim of disparate treatment and thus form an independent act of discrimination.

183.    The Agency is aware of the issue of pay disparity. Indeed, in 2016, Congress as part of the State Department Authorization and Embassy Security Act, stated: (Sec. 413) The State Department is urged to provide attention and oversight to the employment, retention, and promotion of traditionally underrepresented minority groups among mid- and senior-level career professionals through: (1) the International Career Advancement Program, (2) Seminar XXI at the Massachusetts Institute of Technology's Center for International Studies, and (3) other international leadership programs.

184.    The largest shortages of State Department Foreign Service Officers were identified by the Agency itself as <u>residing the Public Diplomacy "cone" the</u> State Department.

185.    While this objectively neutral policy would appear to the casual observer to benefit personnel in the public diplomacy cone, many of whom are women, the impact of the policy, when combined with the Department's unique way of paying employees who remain in a specific rank for a greater period time more and then continuing that advantage, as they promote, produces a disparate impact on women, who end up being paid substantially less at senior positions than their similarly situated male counterparts.

186.    The actions of the Agency taken, *in toto*, amount to a violation of the Equal Pay Act.

## I.  The Administrative Complaint

187.    On November 2, 2016, Ruppe filed an EEO compliant alleging discrimination, retaliation, reprisal and a hostile work environment based on gender, mirroring the above stated acts. She also included her equal pay act claim and her allegations of non-selection and denial of a performance award. Ruppe included in this complaint her allegations under the Rehabilitation Act of 1973, as it related to Ziff's comments and the fact that Ruppe believed they contributed to her failure to be selected and to the retaliatory and hostile work environment she faced.

188.    On January 31, 2017, the Agency accepted for investigation, Ruppe's allegations that the Agency had violated the Equal Pay Act, had failed to select her for DCM positions within the Bureau of European and Eurasian Affairs; had shunned her in the workplace and excluded her from communications and discussions necessary to her position and advancement; had denied her Performance Pay and had created and sustained a hostile work environment "characterized by, but not limited to negative comments, heightened scrutiny and exclusion." Acceptance Letter of January 31, 2017, EEO case No. DOS-0053-17, Pamela Brown Attorney-Advisor.

189.     The Agency also acknowledged that Ruppe had alleged she was the subject to retaliatory reprisal for opposing harassment.

190.      Ruppe's complaint also alleged that she been the subject of discrimination based on sex and discrimination based on perceived disability and a combined theory of sex and disability discrimination.

191.     On January 4, 2017, the Agency acknowledged that the 180 days had commenced with the filing of the formal complaint for it to complete its investigation of Ruppe's claims.

192.     The Agency then commenced an investigation that seemed oddly lopsided.

193.     Ruppe was subject to a battery of virtual document requests and interrogatories. Ruppe was given over 100 questions by the investigator and then subject to follow up interviews that sought to examine in minute detail every aspect the strength of her allegations.

194.     Agency personnel were subject to far fewer questions, which were less involved in scope. Further, their answers were apparently uncritically accepted, while Ruppe's were more heavily scrutinized.

195.     This, along with the initial unexplained delay in processing, suggested the Agency had intentionally skewered the process against Ruppe.

196.     On September 29, 2017, the Agency issued a Final Agency Decision.

197.     Not unexpectedly, the Agency concluded it had not discriminated against Ruppe.

198.     This civil suit is now timely filed within 90 days of that Final Agency Decision.

### COUNT ONE:
### Discrimination based on Gender (Female) in Violation of Title VII of the Civil Rights Act; Non-Selection to DCM

199.      Paragraphs 1-198 are realleged and incorporated by reference as if fully set forth herein.

200.    Title VII's anti-discrimination provision makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a).

201.    Under Title VII, "the two essential elements of a discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's race, color, religion, sex, [or] national origin." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C.Cir.2008).

202.    In the instant action, Ruppe contends that she was denied assignments to DCM positions as a result of her gender.

203.    The denial of selection for DCM positions is adverse action cognizable under Title VII.

204.    The selection to the position involved a promotion or reassignment with significantly different responsibilities, with significant additional benefits, both in terms of stature, pay and advancement opportunities within the Agency.

205.    This Circuit has held that "Adverse employment actions are not confined to hirings, firings, promotions, or other discrete incidents." *Cones v. Shalala*, 199 F.3d 512, 521 (D.C.Cir.2000). They may also involve transfers or reassignments that carry the prospect of greater career opportunities.

206.    As the complaint illustrates, Ruppe was denied selection because of "informal" comments that attacked her alleged lack of "Human Resources Skills."

207.    This language was subtext and pretext for sexual discrimination.

208.    An analysis of the limited grading forms already provided by the Agency reveals that Ruppe was judged adversely based on the vague claim that she was somehow not adept at human resources.

209.    This was based on two employees, as opposed to over 700 employees that she managed overall.

210.    The employees were never identified but were either subordinates who Ruppe had displeased by "reinvigorating" the section or the two former deputies who she contended had engaged in sexual harassment of desk officers.

211.    In addition, it appears clear the selection committee was staffed and\or advised by people who were aware of Ruppe's prior protected activity. While this also supports a retaliation, reprisal and hostile work environment claim, it independently supports a claim of discrimination based on gender.

212.    Ruppe was perceived as a "micro-manager" who had problems with employees, by the selection board.

213.    These claims were code for female assertiveness. Indeed, a review of the selection boards sanitized notes reveals that in general women were judged for their personal relationships with employees while men were judged for the perceived leadership and knowledge skills.

214.    In addition, Ruppe contends that women were excluded from assignments in Europe and Eurasia in general, and that men were historically favored in those selections.

215.    Ruppe also argues that she was substantially more qualified than the ultimate selectees for positions to which she applied and that, at least with respect to the positions in Bulgaria, on which she received some evidence of who was selected and why, she clearly had

greater experience, training and knowledge of the matters likely to be of significance in the Bulgarian arena than the selectee.

216.    Ruppe alleges that the denial of the selections for DCM that she applied to in 2015 and 2016, particularly those in Bulgaria, were due to discriminatory animus based on her gender as a female.

217.    Wherefore, as a remedy, Ruppe seeks selection to a DCM position to which she applied or to one for which she is now qualified. She seeks any pay differential, benefits, front pay, pain and suffering and emotional distress damages up to the statutory maximum, attorneys' fees and costs and injunctive relief requiring the Agency to fully comply with Title VII and not to discriminate against women in the selection for DCM or to the selection of DCM in any arena. Ruppe further seeks any remedy that the Court considers appropriate and just.

<u>**COUNT TWO:**</u>
**Discrimination based on Gender (Female) in Violation of Title VII of the Civil Rights Act;**
**Denial of Performance Pay**

218.    Paragraphs 1-217 are realleged and set forth as if fully incorporated herein.

219.    The denial of Performance Pay was an act of discrimination based on gender.

220.    Additional pay for performance is a material benefit of employment, the denial of which constitutes and adverse action.

221.    On information and belief, Ruppe believes she was denied performance because of her gender.

222.    She believes it was also withheld because she had complained of sexual harassment in the workplace, which would constitute a separate act of retaliation and reprisal and forms part of the hostile work environment she faced.

223.    Ruppe, on information and belief, asserts that males who were approved for performance awards received Performance Pay of up to $2,000.00 or more.

224.    Wherefore, Ruppe requests that she be awarded the Performance Pay she was denied, as well as attorneys' fees and costs for this action.  Ruppe further seeks injunctive relief requiring the Agency to apply uniform Performance Pay guidelines for all SFS and to not discriminate on the basis of gender.

### COUNT THREE:
### Retaliation and Reprisal for Prior Protected Activity under the Title VII of the Civil Rights Act

225.    Paragraphs 1-224 are realleged and incorporated by reference as if fully set forth herein.

226.    Title VII's anti-retaliation provision makes it unlawful for an employer to "discriminate against any of his employees or applicants for employment...because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [the employee or applicant] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a).

227.    Title VII's anti-retaliation provision protects an employee who engages in "opposition" to "any practice made an unlawful employment practice" by the statute. *See* 42 U.S.C. § 2000e–3(a).

228.    To make out a prima facie claim of retaliation, a plaintiff must establish that (1) he engaged in a statutorily protected activity; (2) the employer took an adverse personnel action; and (3) a causal connection existed between the two. *Mitchell v. Baldrige,* 759 F.2d 80, 86 (D.C.Cir.1985); *McKenna v. Weinberger,* 729 F.2d 783, 790 (D.C.Cir.1984).

229.    Ruppe's non-selection for DCM were acts of retaliation and reprisal for prior protected activity.

230.    As detailed in the compliant above, Ruppe reported that women had been sexually harassed by supervisors to Heather Townsend in Human Resources, John Heffern and Benjamin Ziff in 2015, before the acts constituting non-selection occurred.

231.    This was protected EEO activity. Ruppe clearly expressed her concerns that the women were being "bullied" by male supervisors and that the climate in the section had become toxic in this respect.

232.    Ruppe also alleged, separately, that Ziff had treated her in a discriminatory fashion.

233.    Ruppe pointed out to Heffern that she had observed him creating a hostile work environment based on sex, when he consistently favored a female subordinate over other women in the workplace.

234.    Ruppe also pointed out to the Agency how she herself was treated by Ziff, protesting that she had been subject to abuse, innuendo, exclusion from meetings, additional scrutiny and comments about her mental condition that were based on female stereotypes.

235.    Ruppe also challenged the denial of her performance award.

236.    Ruppe also questioned the Agency on whether she was being paid less than male counterparts for identical work.

237.    Ruppe also expressed concern that she had been degraded by Ziff based on her prior reporting of sexually based issues in the workplace and that this lay at the core of his psychological criticisms of her.

238.    Ruppe also pointed out how Ziff had raised questions about her husband and used sexist assumptions to ask if she needed a position to be near her husband, that Ruppe had not requested.

239.    Retaliation and reprisal took two concrete economic forms. First, Ruppe was denied the DCM positions and second, she was denied a performance award.

240.    The actions taken by Ziff and the Agency were designed to discourage Ruppe for engaging in protected activity, as was so clearly expressed by Ziff in December 2015, when he advised her not to pursue claims on behalf of desk officers alleging sexual discrimination.

241.    The non-selection and denial of the award were concrete, material adverse actions in their own right, but they were also forms of retaliation and reprisal since their denial would tend to chill an employee from pursuing their own claims of discrimination, or supporting those of others.

242.    The retaliation and reprisal also produced emotional pain and suffering and embarrassment. As a result, Ruppe further believes her promotional potential in the Agency has been permanently impaired by the Agency's conduct.

243.    As a remedy, Ruppe seeks selection to a DCM position to which she applied or to one for which she is now qualified. She seeks any pay differential, benefits, front pay, pain and suffering and emotional distress damages up to the statutory maximum, attorneys' fees and costs and injunctive relief requiring the Agency to fully comply with Title VII and not to discriminate against women in the selection for DCM or to the selection of DCM in any arena.

244.    In addition, Ruppe seeks to be paid for her performance award, in an amount she estimates to be at least $2,000.00.

245.    Ruppe further seeks any remedy this Court deems just and appropriate.

**COUNT FOUR:**

**Violation of the Rehabilitation Act of 1973; Discrimination based on Perceived Disability**

246.    Paragraphs 1-245 are realleged and incorporated by reference as if fully set forth herein.

247.    The Rehabilitation Act of 1973, which incorporates the standards of the Americans with Disabilities Act as Amended,  provides that an individual has a disability if she (1) has "a physical or mental impairment that substantially limits one or more major life activities of such individual;" (2) has "a record of such an impairment;" or (3) is "regarded as having such an impairment." 42 U.S.C. § 12102(1).

248.    An individual alleging a discriminatory act based on a perceived disability must establish that she has been subjected to a prohibited action,   "because of an actual or perceived physical  or mental  impairment whether  or  not  the  impairment limits  or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A).  Prohibited actions "include but are not limited to" termination or denial of any privilege of employment. 29 C.F.R. 1630.2 *et seq*.

249.     When a plaintiff alleges a perceived disability, the question is not the plaintiff's actual condition, but rather her condition as perceived by her employer, including the reactions and perceptions of the persons interacting or working with her.

250.    As noted above, it is clear that Ziff perceived Ruppe as disabled within the meaning of the Rehabilitation Act of 1973 (which incorporates the standards of the Americans with Disabilities Act as Amended).

251.    Ziff described Ruppe as passive-aggressive, suggested she had emotional problems, hinted that these may have arisen from marital separation or other issues, suggested Ruppe needed

counselling and advised her that she was a micro-manager, whose intensity suggested the existence of a mental illness.

252.    Ziff appears to have passed on these comments, perhaps to counter Ruppe's allegations against him, in a manner that appears to have helped preclude Ruppe from securing a DCM position or receiving a cash award.

253.    The comments also were severe enough to create a hostile work environment based on perceived disability.

254.    The attack on the mental health and competence of an employee is a severe assault on the integrity and fitness of that individual. Indeed, at common law it is a form of defamation per se.

255.    There is little doubt, that Ziff, as part of a campaign to undermine Ruppe, created an environment where she was perceived as somehow impaired in her decision making.

256.    The fact that Ziff mentioned personality traits in front of subordinate workers, also was discriminatory and part of a hostile work environment.

257.    The isolation of Ruppe following these comments were themselves both acts of discrimination and part of the overall hostile work environment.

258.    While a hostile work environment must be sufficiently severe, and is usually displayed by a pervasive stream of infractions that negatively alter the terms and conditions of the work environment, isolated attacks of significant severity can also establish a hostile work environment.

259.    Ziff's claims to Ruppe that she was "passive-aggressive", overly emotional, seemingly distraught, and a micro-manager in need of emotional counselling, rest and help, were individually and collectively acts of discrimination based on a perceived mental health impairment.

They also formed a tapestry that created a hostile work environment that undermined Ruppe's abilities and her standing in the Agency.

260.    Wherefore, as a remedy, Ruppe seeks selection to a DCM position to which she applied or to one for which she is now qualified. She seeks any pay differential, benefits, front pay, pain and suffering and emotional distress damages up to the statutory maximum, attorneys' fees and costs and injunctive relief requiring the Agency to fully comply with the Rehabilitation Act of 1973 and remove all refences in her records that she is emotionally unfit[9]. Ruppe further seeks any remedy that the Court considers appropriate and just.

### COUNT FIVE:
**Violation of Title VII and the Equal Pay Act; Disparate Treatment and Impact where Ruppe and Women are paid less than Men for Substantially Identical Work**

261.    Paragraphs 1-260 are realleged and incorporated by reference as if fully set forth herein.

262.    The Equal Pay Act establishes the "principle of equal pay for equal work regardless of sex," *Corning Glass Works v. Brennan,* 417 U.S. 188, 190, 94 S.Ct. 2223 (1974), and Congress's purpose in passing the law was to remedy the "ancient but outmoded belief" that a man should be paid more than a woman for performing the same duties. *Id.* at 195, 94 S.Ct. 2223 (internal quotation marks omitted); *see also Goodrich v. Int'l Bhd. of Elec. Workers,* 712 F.2d 1488, 1489–90 (D.C.Cir.1983) (recognizing the Equal Pay Act as "firmly establish[ing] as federal law the 'principle of equal pay for equal work regardless of sex' (quoting *Brennan,* 417 U.S. at 190, 94 S.Ct. 2223)). As such, the Equal Pay Act "prohibits payment of unequal wages for equal work on grounds of sex, unless the difference is justified by one of four enumerated defenses: a seniority system, a merit system, a system that measures pay by quality or quantity of production,

---

[9] Ironically, the severe harassment of Ruppe has produced mental health side effects, which is why she seeks pain and suffering.

or any other factor not based on sex." *Thompson v. Sawyer,* 678 F.2d 257, 263 (D.C.Cir.1982) (citing 29 U.S.C. § 206(d)).

263.   To establish a violation of the Equal Pay Act, Ruppe must allege that (1) she was doing substantially equal work on the job, the performance of which required substantially equal skill, effort, and responsibility as the jobs held by members of the opposite sex; (2) the job was performed under similar working conditions; and (3) she was paid at a lower wage than those members of the opposite sex. *See Smith v. Janey,* 664 F.Supp.2d 1, 12 (D.D.C.2009); *Nyman v. Fed. Deposit Ins. Corp.,* 967 F.Supp. 1562, 1577 (D.D.C.1997).

264.   Ruppe alleges that in her position as an FE-MC she was doing the same work as other FE-MC's in the Department who were men and that she was receiving less pay.

265.   Ruppe alleges that this has been an ongoing violation since at least 2011 and that it continues to this date.

266.   Under the Lilly Ledbetter Fair Pay Act of 2009, an unlawful practice occurs, with respect to discrimination in compensation in violation of Title VII, when a discriminatory compensation decision or other practice is adopted, when a person becomes subject to a discriminatory compensation decision or other practice, or when a person is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice. 42 U.S.C. § 2000e–5(e)(3)(A). "In other words, each paycheck resulting from the original 'discriminatory compensation decision or other practice' triggers a new filing period, in effect reviving a claim that otherwise would have been time-barred because of a failure to exhaust administrative remedies." *Johnson v. Dist. of Columbia,* 632 F.Supp.2d 20, 22 (D.D.C. 2009).

267.     Ruppe's allegations of unfair and unequal pay in violation of Title VII and the Equal Pay Act are timely.

268.     Ruppe estimates that she has lost more than $25,000.00 or more per year in salary, along with the additional benefits that flow in terms of retirement calculations and benefits from that hire salary, as a result of the Agency's discriminatory conduct.

269.     The Agency has acknowledged that Ruppe may have been paid less than male counterparts, but contends this is the result of a complicated system that favors salary enhancements that have had more prior time in lower grades.

270.     Ruppe alleges the differential in pay is both a form of disparate treatment of her as a woman and part of a scheme leading to disparate impact for women, in general.

271.     Disparate treatment occurs when "[t]he employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin." *International Bhd. Of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S. Ct. 1843 (1977).

272.     Disparate impact claims, on the other hand, "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Id.* at 336 n. 15, 97 S. Ct. 1843. "Proof of discriminatory motive ... is not required under a disparate-impact theory." *Id.*

273.     Whether by intention or through policy, the State Department's pay scheme as applied to Ruppe and women in general has produced a result where Ruppe is doing the same work as her male counterparts but being paid substantially less.

274.    Because women are shepherded in the Public Diplomacy cone and because they were promoted quickly to possibly address prior discrimination and underrepresentation, the Agency has produced a result where females are being paid less than male counterparts.

275.    Further, under disparate impact theory, the motivations of the employer are irrelevant, thus the inquiry is solely whether Ruppe is being paid less than men, while performing equivalent work of similar skill and responsibility.

276.    To the extent that system produces a disparate impact, the Agency continues to refuse to produce any comparators in which the Ruppe can discern whether her contention is accurate.

277.    Nevertheless, Ruppe asserts she has been subjected to discrimination in that she is not receiving equal pay for equal work and, whether this is intentionally directed against her as a woman, or a by-product of a policy that has discriminatory impact, she is entitled to recoup all pay and benefits of she was deprived, particularly since her promotion to the SFS in 2011.

278.    Wherefore, Ruppe requests that she receive back pay, front pay, interest and adjustment of benefits and attorneys' fees and costs, as well as such other relief the Court sees as just and appropriate.

## COUNT SIX:
### Hostile Work Environment based on Gender, Perceived Disability Status and Gender and Perceived Disability Status

279.    Paragraphs 1-278 are realleged and incorporated by reference as if fully set forth herein.

280.    The above acts of denying Ruppe a DCM position, of precluding her from receiving a monetary award, of  attacking her emotional fitness based on sexual stereotypes and perceptions of decreased mental health, her isolation by Ziff, the whisper campaign against her before the

selection board, the asides on her previously stellar performance reviews, the denigration of her work before subordinates, the denial of fair pay, the comments about staying near her husband, the retaliation against her for reporting misconduct, the exclusion of her and other women in favor of an employee who her supervisor appeared overly attracted to, the failure of the Agency to address her complaints of a sexually harassing work environment, which may have extended to the review of her complaints themselves, and the solicitation of input from undisclosed sources against Ruppe in her promotion attempts, whom she may have opposed on the grounds they had acted improperly, form of web of discrete acts that displays a hostile work environment.

281.    A hostile work environment exists "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' *Singletary v. District of Columbia,* 351 F.3d 519, 526 (D.C.Cir.2003).

282.    The severity and pervasiveness of the conduct described above, set against the backdrop of an Agency struggling to overcome historical discrimination against women, buttress Ruppe's claims that her work environment was severely degraded by the abuse she faced.

283.    Ruppe clearly and unequivocally noted that her work environment was being affected. She reported instances of sexual harassment and favoritism, only to be channeled into a tepid "climate review," which Ziff tried to undermine.

284.    As a result, she was abused psychologically and her otherwise spotless career and future trajectory were negatively altered in a manner that appears permanent to her.

285.    As noted above, the conduct clearly creates a hostile work environment that arises from her Title VII issues, from the Rehabilitation act and from a combination of both theories.

286.    Wherefore, as a remedy, Ruppe seeks selection to a DCM position to which she applied or to one in which she is now qualified. She seeks any pay differential, benefits, front pay, pain and suffering and emotional distress damages up to the statutory maximum, attorneys' fees and costs and injunctive relief requiring the Agency to fully comply with the Rehabilitation Act of 1973 and Title VII and she seeks an injunction against the creation of any further hostile work environment and a removal any and all refences in her records that she is emotionally unfit.[10] Ruppe further seeks any remedy that the Court considers appropriate and just.

## CONCLUSION

287.    Based on the above, Ruppe seeks all remedies identified and damages up to any amount provided by a jury or under statute, as well as all back pay, front pay, benefit recalculations, interest and such other relief as the Court may deem just and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests trial by jury for all claims herein.

DATE: December 28, 2017

Respectfully submitted,

 /s/ Kevin E. Byrnes, Esq.
Kevin E. Byrnes, Esq.
DC Bar No. 480195
**FH+H, PLLC**
1751 Pinnacle Drive, Ste 1000
Tysons, VA 22102
T: (703) 590-1234
F: (703) 590-0366
Kbyrnes@fhhfirm.com
E-file@fhhfirm.com

---

[10] Ironically, the severe harassment of Ruppe has produced mental health side effects, which is why she seeks pain and suffering.