# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| ADELE E. RUPPE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 17-2823 (ABJ) |
| ) | |
| ANTONY BLINKEN, *in his official* ) | |
| *capacity as Secretary of State,* ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Adele Ruppe works as Director of the Office of Public Diplomacy in the Bureau of European and Eurasian Affairs within the U.S. Department of State. Am. Compl. [Dkt. # 12] ¶ 14. She alleges that the agency discriminated against her in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, on the basis of her gender, retaliated against her for engaging in protected activity, subjected her to a hostile work environment, paid her less than her male colleagues in violation of the Equal Pay Act of 1963, 29 U.S.C. § 206(d), and discriminated against her in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq*., on the basis of a perceived disability. Am. Compl. ¶ 1. Pending before the Court is defendant's motion for summary judgment on all counts, Def.'s Mot. for Summ. J. [Dkt. # 67] ("Def.'s Mot."), and plaintiff's cross-motion for summary judgment on her Equal Pay Act claim. Pl.'s Cross Mot. for Partial Summ. J. [Dkt. # 74] ("Pl.'s Mot."). The matter is fully briefed. Pl.'s Mem. in Opp. to Def.'s Mot. [Dkt. # 71-2] ("Pl.'s Opp."); Reply Mem. in Supp. of Def.'s Mot. [Dkt. # 77] ("Def.'s Reply"); Def.'s Mem. in Opp. to Pl.'s Mot. [Dkt. # 78] ("Def.'s Opp."); Reply Mem. in Supp. of Pl.'s Mot. [Dkt. # 85] ("Pl.'s Reply").

For the reasons set forth below, the Court will **GRANT** defendant's motion for summary judgment with respect to Counts I, II, IV, V, VI, and VII.  Because the Court lacks jurisdiction over Count III, it will not address defendant's motion or plaintiff's cross-motion for summary judgment on that claim, and Count III will be **TRANSFERRED** to the United States Court of Federal Claims.  The Court will also **DENY** defendant's motion for leave to amend its answer as **MOOT**.

## BACKGROUND

Plaintiff began her career with the United States State Department in 1993 as a Foreign Service Officer, and she was promoted to the Senior Foreign Service ("SFS") in 2011.  *See* Def.'s Statement of Undisputed Material Facts [Dkt. # 67-1] ("Def.'s SOF") ¶ 46; Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts [Dkt. # 71-1] ("Pl.'s Resp. SOF") ¶ 46.  In 2014, she was promoted from the position of Counselor to Minister Counselor.  *See* Notification of Personnel Action, Ex. 34 to Def.'s Mot. at RUPPE 0018; Pl.'s Resp. SOF ¶ 48.  From May 26, 2014 to May 30, 2017, plaintiff served as an Office Director within the Office of Public Diplomacy for the Bureau of European and Eurasian Affairs ("EUR").  Pl.'s Statement of Undisputed Material Facts [Dkt. # 71-1] ("Pl.'s SOF") ¶ 6; Def.'s Resp. to Plaintiff's Statement of Undisputed Material Facts [Dkt. # 77-1] ("Def.'s Resp. SOF") ¶ 6.

### Work Environment and Climate Survey

"Around February and March 2015" and again in June 2015, plaintiff "sought advice" from the State Department's Ombudsman's Office on "how to handle" what she perceived as "inappropriate treatment" she faced from male deputies "as their supervisor."  Pl.'s Resp. SOF ¶¶ 38–39; Def.'s SOF ¶¶ 38–39, citing Tr. of Adele Ruppe, Ex. 54 to Def.'s Mot. [Dkt. # 67-2]

("Ruppe Dep.") at 121:24-126:19.[1]   It is undisputed that the Office of the Ombudsman handles non-EEO complaints and does not investigate complaints of EEO violations.  Def.'s SOF ¶¶ 36–37; Pl.'s Resp. SOF ¶¶ 36–37.   In June 2015, plaintiff "sought additional advice from the Ombudsman's Office" regarding what she described as a "personnel issue" and "anonymous 360s by unjustly biased people."  Def.'s SOF ¶ 38, citing Ruppe Dep. at 128:10–128:24; Pl.'s Resp. SOF ¶ 38.

On July 10, 2015, plaintiff asked the Ombudsman's Office to conduct a "climate survey" in order to identify "underlying issues that need[ed] addressing" in the office.  Def.'s SOF ¶ 40; Pl.'s Resp. SOF ¶ 40.[2]  On July 31, 2015, plaintiff distributed the survey to her colleagues in the Office of Public Diplomacy within the European Bureau, describing it as "a great way to pulse people in an office on what's working or not working well."  Def.'s SOF ¶ 41; Pl.'s Resp. SOF ¶ 41.   The survey responses identified issues regarding the "vision" of the office, workload distribution, office communication, and "destructive behaviors" such as "malicious gossip." Def.'s SOF ¶ 42; Pl.'s Resp. SOF ¶ 42.

In the summer of 2015, plaintiff also had separate conversations with European Bureau Executive Director Heather Townsend, European Bureau Principal Deputy Assistant Secretary ("PDAS") John Heffren, and her supervisor, Deputy Assistant Secretary ("DAS") Benjamin Ziff, to discuss the work environment within the Bureau and the behavior of her male deputies.  Def.'s SOF ¶¶ 43–45; Pl.'s Resp. SOF ¶¶ 43–45.   Plaintiff testified that in July 2015, she told Ms.

---

1   In her response to defendant's statement of material facts, plaintiff states that she has "[n]o objection as to the cited testimony," but objected "to the suggestion that these were the only issues at hand."  Pl.'s Resp. SOF ¶ 38.

2   A climate survey is "when the ombudsman office comes in and interviews people in the office to see if there are problems and what the issues are, if there are any."  Tr. of Benjamin Ziff, Ex. 52 to Def.'s Mot. [Dkt. # 67-2] ("Ziff Dep.") at 65:12–16.

Townsend "that a female desk officer had complained to [plaintiff] that she was being mistreated"

by a male deputy in their office, that the desk officer "felt that it was abusive, discriminatory

mistreatment of women," and that both the deputy involved and another male deputy were

"mistreating" and "bullying" others in the office.  *See* Ruppe Dep. at 79:18–80:4.  As to her

conversation with PDAS Heffern, plaintiff testified that she told him she had "received a complaint

of mistreatment and bullying of women in [her] office," and that she had reported it to Ms.

Townsend, who was "working with the Ombudsman's Office to conduct a climate survey."  Ruppe

Dep. at 83:23–84:4.  Plaintiff also testified that in August 2015, she informed Mr. Ziff that she had

"received complaints from a female desk officer" that the two male deputies "had been bullying

and mistreating the women in the office."  Ruppe Dep. at 84:17–85:7.[3]  The three officials testified

---

3       The parties disagree as to how the interactions between plaintiff and Ziff should be accurately described.  Plaintiff submits that Ziff repeatedly called her "passive-aggressive" and "paranoid," Pl.'s Resp. SOF ¶ 26, which Ziff testified that he does not recall.  Def.'s Resp. SOF ¶ 26, citing Ziff Dep. at 93:15–97:10.  Plaintiff also testified that Ziff asked her, "[w]ouldn't you like to work in New York where your husband lives?"  Pl.'s SOF ¶ 27, citing Ruppe Dep. at 105:10–15.  Defendant disputes this assertion, pointing to Ziff's testimony that he recalled a conversation with plaintiff "about the option of an assignment in New York 'because she said that she had an apartment in New York' as an alternative to a 'tour in a post where she could not bring her family.'"  Def.'s Resp. SOF ¶ 27, citing Ziff Dep. at 93:15–97:10.  Defendant bases a proposed statement of fact on testimony from Deputy Office Director Lillian DeValcourt-Ayala, in which she "characterized Ziff's treatment of Ruppe as 'professional'" and added that she "never saw him act in a demeaning o[r] derogatory way towards Ruppe."  Def.'s SOF ¶ 62, citing Tr. of Lillian DeValcourt-Ayala, Ex. 58 to Def.'s Mot. [Dkt. # 67-2] ("DeValcourt-Ayala Dep.") at 30:8–10, 103:3–5).  Plaintiff does not take issue with this summary of DeValcourt-Ayala's testimony, but she responds by citing Townsend's testimony that "Ziff's remark to a female colleague about 'bodily secretions' was 'inappropriate in a number of ways' and he 'on occasion said things that [ ] might not be . . . totally appropriate for work."  Pl.'s Resp. SOF ¶ 62 (citation omitted).

          While both sides agree that Ziff characterized plaintiff as a "micromanager," defendant submits that Ziff used the term "in the context of critiquing Ruppe's work performance," Def.'s SOF ¶ 59, and plaintiff disputes the SOF on the grounds that Ziff went "beyond the stated 'context.'"  Pl.'s SOF ¶ 59.  Plaintiff points to her testimony that "he repeatedly called me . . . a micromanager, told me to stop working, to go sit in my office and do nothing."  Pl.'s SOF ¶ 59, citing Ruppe Dep. at 168:9–11.  These differences do not rise to the level of disputes of material fact that preclude resolution of the issues presented in the defendant's motion.

that at that time, they did not interpret plaintiff's transmission of this information as her making a complaint of an EEO violation.  Def.'s SOF ¶¶ 43–45; Pl.'s Resp. SOF ¶¶ 43–45.[4]

### 2016:  Plaintiff's Bids for Deputy Chief of Mission Assignments

Eligible members of the Senior Foreign Service can "bid" for an assignment to serve as the Deputy Chief of Mission ("DCM") at a U.S. embassy or mission.  Def.'s SOF ¶ 1; Pl.'s Resp. SOF ¶ 1.  In 2016, plaintiff submitted nine bids for assignments to serve as the DCM in different parts of Europe, Eurasia, and South America.  Def.'s SOF ¶ 11; Pl.'s Resp. SOF ¶ 11.  Within the Bureau of European and Eurasian Affairs, plaintiff submitted bids for DCM posts in Sofia, Sarajevo, and Vienna.  *See* Def.'s SOF ¶¶ 14–15; Pl.'s Resp. SOF ¶¶ 14–15.  Plaintiff was not selected for any of those positions that year.  *See* Def.'s SOF ¶¶ 20, 24, 27; Pl.'s Resp. SOF ¶¶ 20, 24, 27.

The Department's Standard Operating Procedure governs the process for bidding.  Def.'s SOF ¶ 2; Pl.'s Resp. SOF ¶ 2.  As part of the bidding requirements, DCM candidates must solicit supervisors, peers, and subordinates to complete a "Candidate Tool" survey that rates the applicant on a scale of one to five (deficient to exceptional) on "leadership skills,  management skills, interpersonal and communication skills, and substantive knowledge."  Def.'s SOF ¶ 5, citing Ex. 2 to Def.'s Mot. at RUPPE 0758; Pl.'s Resp. SOF ¶ 5.  After the Department receives timely bids, regional bureaus first "review the candidates, perform due diligence and reference checks, and draw up short lists of their preferred candidates" for DCM assignments in their respective bureaus. Def.'s SOF ¶ 2, citing Standard Operating Procedure, Ex. 5 to Def.'s Mot. ("SOP") at RUPPE 1560; Pl.'s Resp. SOF ¶ 2.  The European Bureau uses "360 surveys" similar to the Candidate Tool, that ask candidates' supervisors, peers, and subordinates – as selected by the candidate – to

---

4    The officials also testified that some people in the Department used the term "bridesmaids" to refer to both men and women who were not promoted, and "meat markets" to refer to meetings to "deconflict personnel assignments."  Def.'s SOF ¶¶ 60–61; Pl.'s Resp. SOF ¶¶ 60–61.

evaluate the candidate's "core competencies," such as substantive knowledge and management skills, and to provide narrative responses on their "strengths and weaknesses."  Def.'s SOF ¶ 5–6; Pl.'s Resp. SOF ¶ 5–6.

Next, each regional bureau transmits a short list of preferred candidates to the department-wide DCM Committee.  Def.'s SOF ¶ 2–3; Pl.'s Resp. SOF ¶ 2–3.  The Committee can accept the Bureaus' recommendations or reject them and select other candidates, and it sends its own short list to the final "selecting official" for interviews and consideration.  Def.'s SOF ¶ 10; Pl.'s Resp. SOF ¶ 10.

After plaintiff submitted her bids and solicited surveys, she received the lowest score of the 19 Sarajevo bidders with survey responses, the second lowest score of the 31 Vienna bidders with survey responses, and the third lowest score of the 18 Sofia bidders with survey responses. Def.'s SOF ¶¶ 33–35; Pl.'s Resp. SOF ¶¶ 33–35.[5]

Plaintiff's 360 evaluations did include some positive comments:  "[s]he's the most policy savvy senior PD professional that I know"; "[d]iscern what resources are needed to achieve the mission. -- she gets an A+"; "[d]evelop the ability to convey the importance of the mission. -- [a]lso an A+."  Pl.'s Resp. SOF ¶ 5, citing Email from EUR and IO Bidder Reference Center to Lillian DeValcourt-Ayala, Ex. 39 to Def.'s Mot. [Dkt. # 67-2] ("DeValcourt-Ayala 360 Resp.") at RUPPE 5312; Def.'s Resp. SOF ¶ 5.  However, the "Area for Improvement" section in the EUR short list memorandum stated that Ruppe "needed to improve her human resource management skills."  Def.'s SOF ¶ 31; Pl.'s Resp. SOF ¶ 31.

State Department deputies who provided 360 reviews for plaintiff were interviewed or deposed and provided information about plaintiff's skills and qualifications:

---

5        Plaintiff notes that some candidates did not have any scores.  Pl.'s Resp. SOF ¶ 35.

- Deputy Office Director Meghan Gregonis characterized plaintiff's approach as "micromanaging," testifying that "at times [plaintiff] would be very involved in the details when sometimes an action officer needed to be working the details and pushing the projects along." Def.'s SOF ¶ 65, citing Tr. of Meghan Gregonis, Ex. 59 to Def.'s Mot. [Dkt. # 67-2] at 80:12–81:17; Pl.'s Resp. SOF ¶ 65.

- Deputy Office Director Lillian DeValcourt-Ayala testified that she believed plaintiff should "give a higher priority to the individual members of the team and their professional development as [an] essential part of an overall highly effective operation," Def.'s SOF ¶ 66, citing DeValcourt-Ayala Dep. at 142:16–143:11, as plaintiff had a tendency to "overload staff and other interlocutors (posts, other bureaus, etc.) with competing priorities if not focused." Pl.'s Resp. SOF ¶ 66, citing DeValcourt-Ayala 360 Resp. at RUPPE 5312.

- PDAS Heffern stated: "I recall that the panel had complimentary things to say about the [plaintiff's] substantive and PD skills, but also that there were concerns expressed about her management skills, by multiple members of both genders. This was not a black-and-white decision but ultimately the [plaintiff] was not placed on the short list because the panel felt there were candidates who were better fits for the position. The Assistant Secretary agreed with this decision." Pl.'s SOF ¶ 15, citing Heffern EEO Investigative Affidavit, Ex. 38 to Def.'s Mot. [Dkt. # 67-2] ("Heffern Affidavit") at 00211; Def.'s Resp. SOF ¶ 15.

The record also reflects that when Ambassador Eric Rubin was asked to consider adding plaintiff to a tentative DCM short list for the Sofia position, he replied, "I am happy to add

[plaintiff].  With pleasure."[6]  Pl.'s SOF ¶ 9; Def.'s Resp. SOF ¶ 9;  Tr. of Eric Rubin, Ex. 60 to

Def.'s Mot. [Dkt. # 67-2] at 94:5–95:21.   Other witnesses disavowed knowledge about what

transpired:

- Assistant Secretary Nuland testified she did not know who removed plaintiff's name from a particular draft EUR shortlist.  Pl.'s SOF ¶ 12, citing Tr. of Victoria Nuland, Ex. 6 to Pl.'s Mot. [Dkt. # 71-3] at 154:15–16; Def.'s Resp. SOF ¶ 12.

- Plaintiff's supervisor, DAS Ziff, testified that he did not recall having any conversations with Assistant Secretary Nuland about plaintiff's DCM bids or being involved in any decisions to remove plaintiff from EUR shortlists.  Pl.'s SOF ¶¶ 13–14; Def.'s Resp. SOF ¶¶ 13–14.  DAS Ziff did not remove plaintiff from the EUR shortlists or speak with members of the DCM committee.  Def.'s SOF ¶¶ 28–29; Pl.'s Resp. SOF ¶¶ 28–29.

At some point after the European Bureau received the 360 survey responses, Principal

Deputy Assistant Secretary Heffern informed plaintiff that she did not make the "above the line"

EUR lists due to the concerns expressed in survey responses about her human resource

management skills.  Def.'s SOF ¶¶ 30–32, citing John Heffern Tr., Ex. 51 to Def.'s Mot. [Dkt.

# 67-2] at 251:16–253:19; 305:1–4; *see* DeValcourt-Ayala 360 Resp. at RUPPE 5312; Pl.'s Resp.

SOF ¶¶ 30–32.  Instead, plaintiff's name fell "below the line."  Def.'s SOF ¶¶ 16, 21, 25; Pl.'s

---

6       Plaintiff states as fact that Ambassador Rubin was advised that "there were adjustments being made to the list by the Bureau" and that plaintiff was removed from the list, to which he replied that he was "[n]ot happy about this."  Pl.'s SOF ¶ 11, citing Email Exchange between Rubin to McDowell, Ex. 2 to Pl.'s Opp. [Dkt. # 75] [SEALED] ("Rubin-McDowell Email Exchange") at RUPPE 4440.  Defendant objects to this statement as an "incomplete and misleading characterization" of the email exchange, Def.'s Resp. SOF ¶ 11, in which Rubin was told that the Bureau had "made a couple of changes from what was proposed," including removing several candidates (including plaintiff) and adding two new ones, and that someone else might be making the final selection.  Rubin-McDowell Email Exchange at RUPPE 4441.  Rubin responded: "Thanks.  Not happy about this.  I do not know [the two new additions].  I will be glad to interview all the candidates.  Please send me the final shortlist and I will reach out to all the candidates.  Bad news from my perspective."  *Id.* at 4440.  He went on to add that "most important[ly]," it had been agreed upon that he would be making the final selections, but that if that was not the case, he would not be interviewing anyone.  *Id.*

Resp. SOF ¶¶ 16, 21, 25.  Candidates who were "below the line" were not on the Bureau's proposed short list to the DCM Committee, but they could still be included by the Committee on the final list of candidates transmitted to the final selecting official for their consideration.  Def.'s SOF ¶ 17; Pl.'s Resp. SOF ¶ 17.

On September 26, 2016, plaintiff sent an email to her Career Development Officer ("CDO"), Katherine Dhanani, stating, "I have decided to withdraw all my bids on DCM jobs in EUR."  Email from Adele Ruppe to Katherine Dhanani, Ex. 9 to Def.'s Mot. [Dkt. # 69] [SEALED] ("Ruppe Withdrawal Email") at RUPPE 4471.  On the same day, she sent an email to Senior Foreign Service Officer Roxanne Cabral stating that "[a]fter careful consideration of the potential damage that will likely be inflicted on my future career prospects, I've decided to withdraw all my bids on EUR DCM jobs in order to . . . preempt any prejudicial discussion at the DCM committee meetings."  Def.'s SOF ¶¶ 12–13, citing Email from Adele Ruppe to Roxanne Cabral, Ex. 10 to Def.'s Mot. at RUPPE 1029; Pl.'s Resp. SOF ¶¶ 12–13.  Plaintiff took this action before the DCM Committee met to consider and approve a final "short list" of candidates to present to the final selecting officials:  Assistant Secretary Nuland for the Vienna and Sarajevo posts, and Ambassador Rubin for the Sofia post.  Def.'s SOF ¶¶ 14–15, 18, 22; Pl.'s Resp. SOF ¶¶ 14–15, 18, 22.[7]  Separate from the EUR bids, plaintiff was selected to the short list for the Bureau of South and Central Asian Affairs and participated in final-round interviews for DCM assignments in Astana and Tashkent, but the results of those selections are not at issue in this litigation.  Pl.'s SOF ¶ 10; Def.'s Resp. SOF ¶ 10.[8]

---

7    Plaintiff's response states that she sent the email after she was no longer under "active bureau consideration" for the EUR DCM positions.  Pl.'s Resp. SOF ¶¶ 14–15, citing SOP at RUPPE 1555.

8    Plaintiff ultimately was not selected for either of these positions.  Ex. 9 to Pl.'s Opp. [Dkt. # 71-3].

**Senior Foreign Service Pay**

Senior Foreign Service members can receive pay increases in several ways:  (1) promotions to a higher SFS rank, (2) annual base salary adjustments through the "Pay-for-Performance system," which provides tier-based percentage increases based on employee performance, or (3) annual performance-based cash awards, called "Performance Pay."  Def.'s SOF ¶¶ 48–51; Pl.'s Resp. SOF ¶¶ 48–51.[9]  The cash awards are granted to no more than the top third of SFS members based on employee performance and certain criteria, ranked annually by the Senior Foreign Service's "Performance Pay Board."  Def.'s SOF ¶¶ 50–52; Pl.'s Resp. SOF ¶¶ 50–52.  The parties agree that plaintiff did not receive any Performance Pay in 2016.[10]  Def.'s SOF ¶ 53; Pl.'s Resp. SOF ¶ 53.  The parties dispute whether plaintiff received pay for performance salary adjustments in any year prior to 2018.[11]

---

9      The parties tend to refer to the base salary adjustments as "pay for performance" and the annual cash awards as "Performance Pay."

10      Plaintiff objects to defendant's explanation that plaintiff did not receive Performance Pay in 2016 "because she was not ranked in the top 33% by the Performance Pay Board."  Pl.'s Resp. SOF ¶ 53; Pl.'s Opp. at 20.  Defendant cites the Declaration of Lisa Vickers, Office Director of the Bureau of Global Talent Management, Officer of Performance Evaluation [Dkt. # 67-3], to establish this fact, Def.'s SOF ¶ 53, but plaintiff complains that she did not know Director Vickers, and that defendant did not identify Director Vickers as a potential witness until summary judgment.  Pl.'s Resp. SOF ¶ 53.

11      Defendant states that plaintiff did not receive "Performance Pay" in any year prior to 2018.  Def.'s SOF ¶ 54, citing Ruppe Dep. 62:23-63:1.  However, in the cited portion of her deposition, plaintiff testified that she received a performance pay award twice during her time in the SFS.  Ruppe Dep. at 62:23-63:1.  Plaintiff's response to defendant's statement of material facts adds that she received "pay for performance (PFP) in several years prior to 2018," but she does not specify the year or point to any support for that assertion in the record.  Pl.'s Resp. SOF ¶ 54.

Defendant's HR Compensation Specialist stated that she could "confirm [plaintiff] was the lowest paid employee promoted to FE-OC in 2011."[12]  Pl.'s SOF ¶ 2; Def.'s Resp. to Pl.'s SOF ¶ 2.  In later years, plaintiff's base pay amounted to $150,061 in 2015, $154,653 in 2016, $160,654 in 2017, and $165,940 in 2018.  Pl.'s SOF ¶¶ 16–18, 22; Def.'s Resp. to Pl.'s SOF ¶¶ 16–18, 22.  Plaintiff provides charts demonstrating that in 2015, two male Public Diplomacy Officer Directors were paid $167,792, and $174,227; in 2016, two male Public Diplomacy Officer Directors were paid $170,726, and $179,558; and in 2017, three male Public Diplomacy Officer Directors were paid $174,837, $175,542, and $181,999, respectively.  Pl.'s SOF ¶¶ 19–21, citing Charts 4A and 4B, Ex. 18 to Pl.'s Mot. at 3–4.[13]

## PROCEDURAL HISTORY

On January 3, 2017, plaintiff filed a formal complaint of discrimination with the Department of State Office of Civil Rights alleging discrimination on the basis of sex and perceived disability, a hostile work environment, and retaliation.  *See* Formal Compl. of

---

12    Defendant agrees that plaintiff was promoted to the SFS from FS-1, step 5 but notes that a male officer was promoted from FS-1, step 4 in 2011 with a lower starting SFS salary than plaintiff. Pl.'s SOF ¶ 7; Def.'s Resp. SOF ¶ 7.  Defendant provides the following formula for determining the salaries of those promoted to the SFS in 2011:

> the sum of the (i) employee's most recent base pay rate as a non-SFS (FS-01) employee (excluding locality or comparability pay), (ii) six percent of that base pay, and (iii) the locality pay the employee would have received as an FS-01 employee had the employee been assigned to Washington, D.C.  The resulting sum was then compared against ninety percent of the salary of a FS-01, step 14 employee receiving Washington, D.C. locality pay.  The greater of these two amounts would become the new SFS officer's salary.

Def.'s SOF ¶ 47.

13    Defendant objects to the admissibility of these charts on the basis that they do not provide the position title of the comparators and that there is "insufficient information to determine what they were 'paid'" in 2015-2017.  Def.'s Resp. SOF ¶¶ 19–21.

Discrimination, Ex. 38 to Def.'s Mot. [Dkt. # 67-2] ("Formal EEO Compl.") at 00001–05; Pl.'s SOF ¶ 23; Def.'s Resp. SOF ¶ 23.[14]   On January 31, 2017, the Department's Office of Civil Rights issued its accepted allegations, which included allegations of underpayment in violation of the Equal Pay Act, as well as discrimination based on sex and perceived disability in connection with the non-selection for DCM positions, the complained-of "exclusion from communications" and lack of Performance Pay, and finally, hostile work environment.  *See* EEO Letter, Ex. 38 to Def.'s Mot. [Dkt. # 67-2] ("EEO Letter") at 00020–21 (January 31, 2017 EEO letter listing accepted allegations).

Plaintiff filed a complaint on December 28, 2017, and she amended it on April 30, 2018.  *See* Compl. [Dkt. # 1]; Am. Compl.  The amended complaint consists of seven counts.  *See* Am. Compl. ¶¶ 144–224.

Count I alleges that plaintiff's non-selection to the European Bureau DCM positions constitutes a failure to promote based on gender in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e–2(a).  *See* Am. Compl. ¶¶ 144–59.  Plaintiff asserts that the denial of a promotion was the product of gender discrimination, which was made evident in the comments that "she was a micro-manager, who had a personality disorder and was passive aggressive, paranoid, controlling and inflexible," all of which were "based on either sexist perceptions of her conduct, or were expressions of discriminatory animus for [her] disclosure of sexist 'bullying.'"[15] Am. Compl. ¶¶ 149–50, 152.  According to plaintiff, this animus colored the judgment of the selection panel members who passed over her to choose lesser qualified candidates, Am. Compl.

14    The EEO Counselor's Report states that plaintiff first requested EEO counseling on November 2, 2016.  *See* EEO Counselor's Report, Ex. 38 to Def.'s Mot. [Dkt. # 67-2] at 00008.

15    In her complaint and other pleadings in the case, plaintiff often blurs the distinction between discrimination and retaliation.

¶¶ 153–54; she posits that when it came to promotions, "*women were judged for their personal relationships with employees, while men were judged for their perceived leadership, knowledge, and skills.*"  Am. Compl ¶¶ 156–57 (emphasis in original).  Plaintiff seeks selection to a DCM or equivalent position, damages, attorneys' fees and costs, and injunctive relief requiring the agency to comply with Title VII.  Am. Compl. ¶ 159.

Count II alleges that defendant's failure to reward plaintiff with Performance Pay is a further violation of Title VII, § 2000e-2(a)(1), in the form of disparate treatment based on gender.  Am. Compl. ¶¶ 160–66.  Plaintiff alleges that the agency failed to pay her commensurate with similarly situated males because of her gender.  Am. Compl. ¶ 161.[16]  Plaintiff requests back pay, damages, attorneys' fees and costs, and injunctive relief ordering the agency to apply uniform Performance Pay guidelines in the SFS.  Am. Compl. ¶ 166.

Plaintiff raises Equal Pay Act allegations in Count III.  Am. Compl. ¶¶ 167–78.  She asserts that she was "compensated at a substantially lesser rate on jobs performed by less experienced male employees who have received higher compensation in the same jobs" and that she received fewer pay raises and bonuses than similarly situated males performing the same duties.  Am. Compl. ¶¶ 169–70.  Plaintiff avers that although the agency contends that pay is based on an "ill-defined 'rank-in-person' system," women in the Foreign Service are "routinely being paid less than their male counterparts."  Am. Compl. ¶ 173.  Plaintiff requests back pay, front pay, interest, an adjustment of benefits, and attorneys' fees and costs.  Am. Compl. ¶ 178.

---

16    Plaintiff adds that she believes Performance Pay "was also withheld because she had complained of sexual harassment in the workplace," which she notes would constitute a "separate act of retaliation and reprisal and forms the basis for part of the hostile work environment she faced."  Am. Compl. ¶ 163.

Count IV is another disparate impact claim brought under Title VII, § 2000e–5(e)(3)(A). Am. Compl. ¶¶ 179–90. Plaintiff asserts that the combination of defendant's hiring policies and its policy of including tenure in lower grades as a basis for pay at higher levels has a disparate impact on women, who tend to have less tenure at the State Department. Am. Compl. ¶¶ 180–82, 185. Plaintiff maintains that defendant's "pay scheme as applied to [her] and women in general, has produced a result where [she] is doing the same work as her male counterparts but being paid substantially less, resulting in a disparate impact on women." Am. Compl. ¶ 187. Plaintiff requests attorneys' fees and costs, as well as injunctive relief requiring the agency to apply uniform and non-discriminatory salary and award guidelines for all SFS members. Am. Compl. ¶ 190.

Count V asserts that plaintiff has suffered retaliation in violation of Title VII, § 2000e–3(a), for reporting workplace sexual harassment to her superiors. Am. Compl. ¶¶ 191–202. Plaintiff alleges that she was denied the DCM positions and denied a performance award in 2016 after reporting sexual harassment in the workplace to Executive Director Townsend, PDAS Heffern, and DAS Ziff. Am. Compl. ¶¶ 193–98. She also maintains that the alleged retaliation and reprisal "produced emotional pain and suffering and embarrassment," permanently impaired her potential for future promotion within the agency, and "would tend to chill" employees from pursuing claims of discrimination. Am. Compl. ¶¶ 195–96. She alleges that the defendant failed to investigate her claims and allowed "the targets of [her] complaints, supervisory personnel, and other personnel to whom she complained and who took no action" to participate in determining her eligibility for Performance Pay and whether she would be selected for DCM positions, all of which constituted not only retaliation, but a hostile work environment. Am. Compl. ¶¶ 199–201. Plaintiff seeks selection to a DCM position to which she applied or to an equivalent position to which she is qualified, back pay and front pay, emotional distress damages, other compensatory

damages, attorneys' fees and costs, and injunctive relief requiring compliance with Title VII in the selection of DCM positions.  Am. Compl. ¶ 202.

In Count VI, plaintiff alleges that she was subjected to a hostile work environment in violation of Title VII.  Am. Compl. ¶¶ 203–11.  She states that she was "abused psychologically" and that her "otherwise spotless career and future trajectory were negatively altered" when the agency denied her a promotion and performance awards and focused instead on her personal characteristics.[17]  Am. Compl. ¶ 207–08.  Plaintiff further alleges that the agency's decision not to conduct an EEO investigation into her complaints despite the agency's "struggling to overcome historical discrimination against women" reflects a "conscious effort" to create a hostile work environment.  Am. Compl. ¶¶ 205–06, 208–09.  Plaintiff requests selection to a DCM position to which she applied or to an equivalent position to which she is qualified, back pay and front pay, emotional distress damages, other compensatory damages, and attorneys' fees and costs.  Am. Compl. ¶ 210.  She also seeks injunctive relief requiring compliance with Title VII and requiring

---

17    Plaintiff alleges that the following events or actions comprise the hostile work environment:

> [D]enying Ruppe a DCM position; impeding her from receiving a monetary award; attacking her emotional fitness based on sexual stereotypes and perceptions of decreased mental health; her isolation by Ziff; the whisper campaign against her before the selection panel; the asides on her previously stellar performance reviews; the denigration of her work before subordinates; the denial of fair pay; the comments about staying near her husband; the retaliation against her for reporting misconduct; the exclusion of her and other women in favor of an employee who her supervisor appeared to have an inappropriate interest in; the failure of the Agency to address her complaints of sexual harassment in the work environment; and the solicitation of input from undisclosed sources against Ruppe in her promotion attempts . . .

Am. Compl. ¶ 204.

the agency to remove "any and all references in her records that she is emotionally unfit."  Am. Compl. ¶¶ 210–11.

Count VII alleges discrimination based on perceived disability in violation of the Rehabilitation Act of 1973, 42 U.S.C. § 12101, *et seq*.  Am. Compl. ¶¶ 212–23.  Plaintiff alleges that DAS Ziff regarded plaintiff as having a disability, and discriminated against her on the basis of that perception when he allegedly concluded that plaintiff was unfit for promotion and shared these beliefs with others "in a manner that appears to have precluded Ruppe from securing a DC position or receiving a cash award."  Am. Compl. ¶¶ 213–16, 218–20.  Specifically, plaintiff alleges that DAS Ziff regarded her as "having passive-aggressive disorder and paranoid personality disorder," and that he created a hostile work environment that undermined plaintiff's abilities and standing in the agency her as a result.  Am. Compl. ¶ 217, 219.  Plaintiff seeks selection to a DCM position to which she applied or to an equivalent position to which she is qualified, back pay and front pay, emotional distress damages, other compensatory damages, attorneys' fees and costs, and injunctive relief requiring compliance with the Rehabilitation Act and removal of "all references in her records that she is emotionally unfit."  Am. Compl. ¶ 223.

On November 7, 2022, defendant filed a motion for leave to file an amended answer to the amended complaint.  Def.'s Mot. for Leave to Amend Answer. [Dkt. # 79] ("Def.'s Mot. to

Amend").  The matter is fully briefed and pending before the Court.  Pl.'s Mem. in Opp. to Def.'s

Mot. to Amend [Dkt. # 81]; Reply Mem. in Supp. of Def.'s Mot. to Amend [Dkt. # 82].[18]

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  The party seeking summary judgment "bears the initial responsibility of informing the

district court of the basis for its motion, and identifying those portions of the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  To defeat summary

---

18      As the Court stated in its August 7, 2023, Order, *see* Dkt. # 83:

> A review of the redlined version of the complaint attached to the motion
> revealed little that changed anything in a way that would prejudice the
> plaintiff . . . .  [P]laintiff's opposition to the motion [Dkt. # 81] primarily
> expressed consternation about the lateness of the proposed amendment in
> general.  But she did complain about the substance of one of the proposed
> amendments in particular, and it relates to her Count VII claim for
> discrimination based on a "perceived disability."

> In plaintiff's first amended complaint, she alleged:  that "Ziff [her
> supervisor] is not a licensed member of the healing arts and has no medical,
> psychiatric or psychological training, yet he perceived Ruppe as mentally
> impaired contending she was [']passive-aggressive['] and paranoid."  First
> Am. Compl. ¶ 89 [Dkt. # 12].  In its answer, the government said:
> "Defendant admits the allegations contained in Paragraph 89 of the
> complaint."  Answer ¶ 89 [Dkt. # 13].  Now defendant wants the responsive
> paragraph to read:  "Defendant admits that Ziff is not a 'licensed member
> of the healing arts and has no medical, psychiatric or psychological training'
> but otherwise denies the remaining allegations contained in Paragraph 89 of
> the complaint."  Ex. A to Def.'s Mot. to File Am. Answer [Dkt. # 79] at
> ¶ 89.

judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted).

The mere existence of a factual dispute is insufficient to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is "material" only if it is capable of affecting the outcome of the litigation.  *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).  In assessing a party's motion, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary judgment motion.'"  *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations omitted), quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).

 "The rule governing cross-motions for summary judgment . . . is that neither party waives the right to a full trial on the merits by filing its own motion; each side concedes that no material facts are at issue only for the purposes of its own motion."  *Sherwood v. Wash. Post*, 871 F.2d 1144, 1147 n.4 (D.C. Cir. 1989) (alteration in original), quoting *McKenzie v. Sawyer*, 684 F.2d 62, 68 n.3 (D.C. Cir. 1982).  In assessing each party's motion, "[a]ll underlying facts and inferences are analyzed in the light most favorable to the non-moving party."  *N.S. ex rel. Stein v. District of Columbia*, 709 F. Supp. 2d 57, 65 (D.D.C. 2010), citing *Anderson*, 477 U.S. at 247.

## ANALYSIS

### I.   Count I:   Non-Selection for European Bureau Deputy Chief of Mission Assignments

Title VII prohibits discrimination "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–2(a)(1).  To state a claim under Title VII's antidiscrimination provision, a plaintiff must establish that she (1) suffered an adverse

18

employment action (2) because of the plaintiff's race, color, religion, sex, national origin, age, or disability. *See Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008).   An adverse employment action requires "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).

"If a Title VII plaintiff does not proffer direct evidence of discrimination," courts are required to apply the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Hairston v. Vance-Cooks*, 773 F.3d 266, 272 (D.C. Cir. 2014) (citation omitted).   Under that framework, a plaintiff bears the initial burden of coming forward with a prima facie case of discrimination. *Id.*, citing *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 252–53 (1981).   If a plaintiff establishes a prima facie case, "the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason" for that action. *Id.*, citing *Burdine*, 450 U.S. at 253.   To then survive summary judgment, the plaintiff must prove that defendant's explanation is "pretext for discrimination." *Id.*, citing *Burdine*, 450 U.S. at 253.

However, the D.C. Circuit has held that in cases involving denied increases in pay or promotions, "the traditional *McDonnell Douglas* test does not fit." *Taylor v. Small*, 350 F.3d 1286, 1294 (D.C. Cir. 2003), citing *Cones v. Shalala*, 199 F.3d 512, 517 (D.C. Cir. 2000).   Rather, to prove a prima facie claim of discrimination involving a failure to promote, a plaintiff must demonstrate that (1) she belongs to a protected class; (2) she was qualified for and applied for the promotion; (3) she was considered for but denied the promotion; and (4) other similarly qualified employees outside of the protected class were promoted at the time. *See Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981); *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003).

Here, plaintiff alleges that the State Department failed to promote her on the basis of her sex, but this claim fails for lack of an adverse action because the undisputed facts show that she withdrew from consideration before the decision was made. Def.'s SOF ¶¶ 12–15; Pl.'s Resp. SOF ¶¶ 12–15. And even if plaintiff did suffer an adverse action in connection with the bid process, she has not come forward with any evidence to support a finding that the failure to promote her within the European Bureau was because of her sex.

### a. Plaintiff's withdrawal from consideration negates her claim of discrimination.

Plaintiff has failed to establish a prima facie case of discrimination in connection with the failure to select her for any European Bureau DCM post. "There can be no adverse employment action where a plaintiff, of [her] own volition and despite being individually encouraged to do so, failed to complete the application process." *See Burt v. Nat'l Republican Club of Capitol Hill*, 828 F. Supp. 2d 115, 125 (D.D.C. 2011), *aff'd*, 509 F. App'x 1 (D.C. Cir. 2013). And here, it is undisputed that plaintiff withdrew her bids for EUR DCM jobs before the DCM Committee met to consider and approve its final selections. Def.'s SOF ¶¶ 14–15; Pl.'s Resp. SOF ¶¶ 14–15. Plaintiff's withdrawal of her EUR DCM bids constitutes a failure to complete the application process, and that means there is no actionable non-selection decision to be challenged here. *See Lee v. Mabus*, 955 F. Supp. 2d 33, 43 (D.D.C. 2013) (finding plaintiff did not establish a prima facie case of discrimination where he did not take the steps necessary to obtain accretion of duties promotion).

Plaintiff contends that the Bureau ceased active consideration of her bids before she sent the September 26, 2016 email taking her name out of circulation, Pl.'s Opp. at 10; *see also* Pl.'s Resp. SOF ¶ 12, but there is no genuine dispute of fact concerning whether the process was still ongoing. In her email to her Career Development Officer ("CDO") Katherine Dhanani, plaintiff

wrote, "I have decided to withdraw all my bids on EUR DCM jobs," Ruppe Withdrawal Email at
RUPPE 4471, which reflects her clear understanding that she was still under active consideration.
Also, as plaintiff admitted in her email to Senior Foreign Service Officer Roxanne Cabral, she was
withdrawing her bids to "preempt any prejudicial discussion at the DCM committee meetings,"
indicating that the Committee had not yet met to evaluate candidates. *See* Def.'s SOF ¶¶ 12–13,
citing Email from Adele Ruppe to Roxanne Cabral, Ex. 10 to Def.'s Mot. at RUPPE 1029; Pl.'s
Resp. SOF ¶¶ 12–13. It is also undisputed that the DCM Committee had the ability to include
bidders who were "below the line" in the EUR's memo to the DCM final shortlist. *See* Def.'s SOF
¶ 17; Pl.'s Resp. SOF ¶ 17.

Moreover, the Standard Operating Procedures support the finding that plaintiff's
withdrawal was what ended her consideration. The procedures provide that an employee who
wishes to withdraw her bids for consideration must inform her CDO of her intent to withdraw.
Pl.'s Resp. SOF ¶ 15. The CDO will communicate the request to the relevant bureau, and the
Bureau will "inform the CDO whether the employee is under active bureau consideration for the
position." *Id.* The bid "may be withdrawn" if either "the bureau indicates that the employee is
not under consideration" *or* if "the bureau does not respond within [one working week]." *See id.*,
citing Ex. 5 to Def.'s Mot. at RUPPE 1555. The record reflects that plaintiff informed the DCO
of her intent to withdraw in accordance with those procedures. *See* Ruppe Withdrawal Email.
Plaintiff does not point to any evidence that the EUR affirmatively indicated that she was not under
consideration; therefore, under the Standard Operating Procedures, plaintiff's withdrawal would
have become effective after the one-week period elapsed and before the agency made final DCM
selections. Given that the DCM Committee shortlists were not finalized at that time, and that
plaintiff's stated concern was that further discussion of her candidacy could inflict "potential

damage" on her future career prospects, there is no evidence to create a jury issue on the question of whether it was plaintiff's withdrawal that terminated her consideration for the DCM posts. Plaintiff's failure to complete the application process is fatal to the discrimination count because she did not suffer the adverse action that is the necessary predicate for a prima facie claim.

In her opposition to defendant's motion for summary judgment, plaintiff suggests that pursuing her application would have been futile. Pl.'s Opp. at 11. This can be an exception to the application requirement, *see Lathram*, 336 F.3d at 1089, citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 365–66 (1977), but plaintiff does not point to any evidence that would give rise to a triable issue for the jury on this issue.

To prove futility, a plaintiff must show that "(1) her employer['s] policy of 'gross and pervasive' discrimination communicated to a protected class the futility of applying, and (2) that she 'would have applied for the job had it not been for those practices.'" *Carroll v. England*, 321 F. Supp. 2d 58, 67–68 (D.D.C. 2004), quoting *Int'l Bhd. of Teamsters*, 431 U.S. at 367–69. This is a high threshold, intended to reach "the most invidious effects of employment discrimination" and ensure that victims are not denied relief "because the unlawful practices had been so successful as totally to deter job applications from members of minority groups." *Int'l Bhd. of Teamsters*, 431 U.S. at 367. Here, plaintiff did apply, other SFS women submitted bids for the same positions, and the Bureau selected a woman for one of the three European positions. Def.'s SOF ¶¶ 11, 24; Pl.'s Resp. SOF ¶¶ 11, 24. Since plaintiff has not pointed to anything in the record that would enable a juror to find that "gross and pervasive" discrimination completely deterred women in the SFS from applying to the posts, plaintiff cannot forestall summary judgment on the grounds that

pursuing her applications further would have been futile.  For all of these reasons, defendant is

entitled to summary judgment on Count I.[19]

---

19    Even if plaintiff had completed the application process for purposes of the adverse action
element, there is no genuine dispute of material fact on the question of whether the non-selection
was made "'under circumstances which give rise to an inference of discrimination.'"  *Chambers
v. District of Columbia*, 35 F.4th 870, 878 (D.C. Cir. 2022) (emphasis removed), quoting *Harding
v. Gray*, 9 F.3d 150, 152 (D.C. Cir. 1993) (quotation omitted).  Plaintiff contends that the opinions
of her superiors and the selecting officials were colored by DAS Ziff's alleged discriminatory
animus toward her.  Pl.'s Opp. at 9–10.  While employers can be held liable when a biased
supervisor influences unbiased decisionmakers under the "cat's paw theory," plaintiff has not
come forward with evidence that DAS Ziff was involved with any of the decisions regarding
plaintiff's non-selection to the DCM assignments.

To establish liability under what is known as a "cat's paw" theory, a plaintiff must
demonstrate that (1) a supervisor performed an act motivated by discriminatory animus; (2) the
supervisor intended the act to cause an adverse employment action; and (3) that act was a
proximate cause of the ultimate employment action.  *See Staub v. Proctor Hosp.*, 562 U.S. 411,
422 (2011); *see also Morris v. McCarthy*, 825 F.3d 658, 672–73 (D.C. Cir. 2016) (applying *Staub*
to hold that plaintiff provided sufficient evidence that her supervisor's animus colored the opinion
of the ultimate decision maker when the supervisor's claims informed the decision); *Parker v.
Nat'l R.R. Passenger Corp.*, 214 F. Supp. 3d 19, 27 (D.D.C. 2016) (finding no liability when
decisionmaker independently assessed employment action based on evidence and investigation
separate from biased subordinate's opinion).

Even if one were to accept plaintiff's assertion that DAS Ziff was biased against her based
on her sex, the undisputed facts do not demonstrate that any of Ziff's actions were the proximate
cause of her non-selection.  Ziff did not remove plaintiff's name from any EUR DCM short list,
speak with members of the DCM committee, or even hold decision-making authority over the
EUR short lists, DCM Committee short lists, or final DCM selections.  Def.'s SOF ¶¶ 9; 28-29;
Pl.'s Resp. SOF ¶¶ 9; 28-29.  While plaintiff has had the opportunity to depose all of the relevant
decisionmakers, she has not pointed to any evidence that Ziff made any effort to influence the
decision made by the final selecting officials or conveyed a biased negative assessment to them.
*See Parker*, 214 F. Supp. 3d at 27 (finding no liability when decisionmaker independently assessed
employment action based on evidence and investigation apart from biased subordinate's opinion).
Indeed, with respect to the Sofia assignment, plaintiff cites evidence that Ambassador Rubin had
a favorable opinion of her, and yet he still chose another candidate.  Def.'s SOF ¶ 20; Pl.'s Resp.
SOF ¶ 20; Pl.'s SOF ¶ 9; Def.'s Resp. SOF ¶ 9.  Plaintiff also points to her more positive bidding
experience in the South and Central Asian Bureau as evidence of discrimination in the European
Bureau, Pl.'s Opp. at 12–13, but this is not comparable since she completed the application process
with respect to those positions.

23

## II.        Count II:  Denial of Performance Pay

Plaintiff alleges that the agency subjected her to disparate treatment based on her gender when it denied her Performance Pay in 2016.  Am. Compl. ¶¶ 160–66.

To state a prima facie case of disparate treatment discrimination within the *McDonnell Douglas* framework, a plaintiff must demonstrate that (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the adverse action gives rise to an inference of discrimination.  *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005) (citations omitted); *Forkkio v. Powell*, 306 F.3d 1127, 1130 (D.C. Cir. 2002).  The first two elements are not at issue. It is undisputed that plaintiff belongs to a protected class, and the denial of a performance-based monetary award, which is undisputed here, constitutes an adverse employment action under Title VII.  *Russell v. Principi*, 257 F.3d 815, 817 (D.C. Cir. 2001) ; *Saba v. U.S. Dep't of Agric.*, 26 F. Supp. 3d 16, 25 (D.D.C. 2014).

However, plaintiff fails to point to any evidence in the record that would give rise to an inference that the Performance Pay Board engaged in sex-based discrimination.  In her opposition to defendant's motion for summary judgment, plaintiff argues that as to the third element, the D.C. Circuit "has held more favorable treatment to employee[s] outside the protected group may demonstrate discriminatory bias."  Pl.'s Opp. at 21, citing *Breiterman v. United States Capitol Police*, 15 F.4th 1166, 1174 (D.C. Cir. 2021).  It is true that a plaintiff may support an inference of discrimination with a showing that the employer treated the plaintiff differently than similarly situated employees outside the protected class.  *See Breiterman*, 15 F.4th at 1174; *see also Nurriddin v. Bolden*, 818 F.3d 751, 761 (D.C. Cir. 2016) (explaining that while such a showing is not required, "[t]he best evidence demonstrating unequal treatment would be a comparison.").  But plaintiff has not made such a showing.

24

Plaintiff asserts in her opposition to defendant's motion for summary judgment that "during 2016 there was a marked dearth of female PD SFS officers who received performance pay, as compared to the number of male PD SFS officers who did, as well as a gap in average amount granted, and the total amount allocated." Pl.'s Opp. at 20–21.  She points to evidence that in 2016, 26% of male public diplomacy SFS officers received performance pay awards, while only 11% of female public diplomacy SFS officers received performance pay awards. Pl.'s Opp. at 21.  But this statistic does not demonstrate that plaintiff herself was treated differently from similarly situated employees.  To establish that these comparators were "similarly situated," plaintiff must also demonstrate that "all of the relevant aspects of her employment situation were nearly identical to those of the male employee." *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999) (internal quotation marks and citation omitted).  Plaintiff has not pointed to any such evidence to support an inference of intentional discrimination.

Moreover, plaintiff undermines her argument by providing statistical evidence that the Performance Pay Board gave similar percentages of awards to male and female political officers in 2016.  Pl.'s Opp. at 21 (stating that 49.7% of male political officers and 46.57% of women political officers received performance pay awards).  Plaintiff contends that she was a strong performer in 2016 too, and she complains that defendant has failed to explain why she did not fall within the top third of employees who were selected to receive awards. Pl.'s Mot. at 22.  However, in the absence of any evidence to show that the Performance Pay Board discriminated against plaintiff based on her sex, the burden does not shift to the defendant to proffer a reason for its decision.  Therefore, defendant's motion for summary judgment will be granted with respect to Count II.

### III.     Count III:  Violation of the Equal Pay Act

In Count III, plaintiff alleges that defendant violated the Equal Pay Act, and she seeks more than $10,000 in damages.  Am. Compl. ¶¶ 167–78; Def.'s SOF ¶ 55; Pl.'s Resp. SOF ¶ 55.  While defendant has moved for summary judgment on this claim, both parties acknowledge that they face a jurisdictional hurdle before the Court can consider the merits of this claim.

Defendant concedes that in *Waters v. Rumsfeld*, 320 F.3d 265, 270–72 (D.C. Cir. 2003), the D.C. Circuit held that under the Tucker Act, claims in excess of $10,000 under the Fair Labor Standards Act – which includes the Equal Pay Act – fall within the "exclusive jurisdiction" of the Court of Federal Claims, which has "jurisdiction over a non-tort monetary claim 'against the United States founded . . . upon . . . any Act of Congress.'"  *Abbey v. United States*, 745 F.3d 1363, 1368–69 (Fed. Cir. 2014), quoting 28 U.S.C. § 1491(a)(1); Def.'s Mot. at 20 n.7.  Thus, unless plaintiff waives her claim in excess of $10,000, "the district court [is] without jurisdiction to rule on [the] merits."  *Waters*, 320 F.3d at 272.

The parties have both taken the position, though, that the D.C. Circuit's holding in *Waters* is "no longer good law considering the Supreme Court's reasoning in *United States v. Bormes*, 568 U.S. 6, 19 (2012)."  Def.'s Mot. at 20 n.7; *see also* Pl.'s Opp. at 31 n.13.  In *Bormes*, the Court considered whether the Tucker Act waived the United States' sovereign immunity against claims brought under a different statute:  the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681.  *See* 568 U.S. at 9–15. The Court held that it did not, because "[t]he Tucker Act is displaced . . . when a law assertedly imposing monetary liability on the United States contains its own judicial remedies.  In that event, the [law's] specific remedial scheme establishes the exclusive framework for the liability Congress created under the statute."  *Id.* at 12.

While the D.C. Circuit has not yet considered the issue, the Federal Circuit has, and other courts in this district have applied its reasoning.  In *Abbey v. United States*, the Federal Circuit found that because the FLSA and FCRA had significant differences, *Bormes* did not disturb the settled precedent that the Court of Federal Claims has exclusive jurisdiction over FLSA claims exceeding $10,000.  745 F.3d at 1369–70.  The court noted that the FCRA "precisely define[s] the appropriate forum" to bring claims, including "any appropriate United States district court."  *Id.* at 1369, citing *Bormes*, 568 U.S. at 15 (citation omitted).  The FLSA, by contrast, "contains no congressional specification of a non-Tucker Act forum for damages suits."  *Id.* at 1370.  Because the FLSA does not provide any guidance as to which court is competent to exercise jurisdiction over those claims, the *Abbey* court concluded that it was appropriate to look to the Tucker Act to identify the court of competent jurisdiction.  *Id.*

This Court has previously found the Federal Circuit's decision in *Abbey* to be persuasive, and it will continue to join other courts in this Circuit in declining to adopt defendant's position. *See Atta v. Consumer Fin. Prot. Bureau*, No. CV 18-2033, 2019 WL 13292029, at *2 (D.D.C. Apr. 29, 2019); *see also Alston v. Bethea*, No. CV 22-3595, 2023 WL 4198203, at *3 (D.D.C. June 27, 2023); *Johnson v. Lightfoot*, 273 F. Supp. 3d 278, 287-88 & n.5 (D.D.C. 2017); *Adair v. Bureau of Customs and Border Prot.*, 191 F. Supp. 3d 129, 134 (D.D.C. 2016).  Moreover, unless and until the D.C. Circuit announces that its decision in *Waters v. Rumsfeld* has been overruled by *Bormes*, the Court is "obligated to follow controlling circuit precedent."  *United States v. Torres*, 115 F. 3d 1033, 1036 (D.C. Cir. 1997).  Therefore, the Court finds that the Court of Federal Claims has exclusive jurisdiction over Count III because it is a non-tort monetary claim brought against the

United States government exceeding $10,000, and the claim will be **TRANSFERRED** to the United States Court of Federal Claims.[20]

## IV.    Count IV:  Disparate Impact Based on Gender in Violation of Title VII

In Count IV, plaintiff alleges that defendant's policy of "including tenure in the lower grades as a basis for pay in higher positions" led to an actionable disparity in women's salaries. Am. Compl. ¶¶ 179–82.  The Court agrees with defendant that it is entitled to summary judgment on Count IV because plaintiff failed to administratively exhaust this claim.

Title VII requires that before filing a lawsuit in federal court, a plaintiff must timely pursue and exhaust administrative remedies.  *Hamilton v. Geithner*, 666 F.3d 1344, 1349 (D.C. Cir. 2012); *Washington v. Wash. Metro. Area Transit Auth.*, 160 F.3d 750, 752 (D.C. Cir. 1998); *see also Bowden v. United States*, 106 F.3d 433, 436 (D.C. Cir. 1997).  To timely exhaust administrative remedies, an employee must consult an agency EEO Counselor within 45 days of the alleged discriminatory event, 29 C.F.R. § 1614.105, and must file a formal complaint within 180 days of the alleged discriminatory event.  *See* 42 U.S.C. § 2000e–16(c); 29 C.F.R. § 1614.106(e).  Failure to exhaust is an affirmative defense that the defendant bears the burden of proving.  *See Bowden*, 106 F.3d at 437 (further explaining that "[i]f the defendant meets its burden, the plaintiff then bears the burden of pleading and proving facts supporting equitable avoidance of the defense.") (citations omitted).

Plaintiff argues that because she "articulated her theory in her EEO formal complaint," the legal claims in the amended complaint are "like or reasonably related" to the allegations of the

---

[20]    In her opposition to defendant's motion for summary judgment, plaintiff requested that if the Court finds it does not have subject matter jurisdiction over her EPA claim, this matter should be transferred to the Court of Federal Claims rather than dismissed.  Pl.'s Opp at 31 n.13.  At a status conference held on January 5, 2024, both parties agreed with this approach.

administrative complaint, and therefore, they were administratively exhausted.  Pl.'s Opp. at 34,

citing *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995).   The Court construes this

argument as an attempt to claim a continuing violation under *Park*, but it is unclear whether that

doctrine has survived the Supreme Court's decision in *Nat'l R.R. Passenger Corp. v. Morgan*, 536

U.S. 101 (2002) for discrimination claims.  A majority of courts in this district have concluded

that *Morgan* overruled the *Park* "like or reasonably related" rule, and that therefore, every discrete

claim of discrimination must be administratively exhausted.[21]  *See Rashad v. Wash. Metro. Area*

*Transit. Auth.*, 945 F. Supp. 2d 152, 165–66 (D.D.C. 2013) (collecting cases that hold that

plaintiffs "must exhaust the administrative process regardless of any relationship that may exist

between those discrete claims and any others.").  Other courts have found that *Morgan* did not

overrule *Park*, and that a plaintiff may still bring unexhausted claims of discrimination when the

claims are "of a like kind to the [] acts alleged in the EEOC charge, which were specified to be of

an ongoing and continuing nature."  *Smith-Thompson v. Dist. of Columbia*, 657 F. Supp. 2d 123,

136–38 (D.D.C. 2009), citing *Wedow v. City of Kansas City, Mo.*, 442 F.3d 661, 673 (8th Cir.

2006).

But the Court need not resolve that issue, because it finds that plaintiff failed to exhaust

her administrative remedies both because her allegations of disparate impact present a discrete

claim for which no EEO charge was filed, *and* because her disparate impact claims are not "like

or reasonably related to the allegations" alleged in the EEO complaint.   While plaintiff filed a

formal EEO complaint on January 3, 2017, this complaint did not include a disparate impact claim

or identify any departmental pay practice that had a discriminatory impact on women.  *See* Formal

---

21    This test does not apply to hostile work environment claims, which the Court addresses
separately in Section VI.

EEO Compl. at 00001–05.  Rather, plaintiff's EEO complaint included claims of sex and disability discrimination, hostile work environment, retaliation, and violations of the Equal Pay Act.  *See id.*; *see also* EEO Letter at 00020–21.  While the administrative complaint contains allegations of disparate *treatment*, these do not exhaust a claim for disparate *impact*, which is a separate cause of action.  *See E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 771 (2015) (explaining that the "disparate treatment" provision and the "disparate impact" provision are two distinct causes of action under Title VII); *see also Brigida v. Chao*, No. 16-CV-2227 (DLF), 2020 WL 12848946 (D.D.C. Oct. 12, 2020) ("Disparate treatment allegations contained in an administrative complaint do not exhaust the separate "cause[] of action" of a disparate impact claim."), citing *Bartlette v. Hyatt Regency*, 208 F. Supp. 3d 311, 324 (D.D.C. 2016) (finding that disparate treatment allegations in EEOC charge did not allege or imply disparate impact claims to exhaust administrative remedies), and *Hopkins v. Whipple*, 630 F. Supp. 2d 33, 40–41 (D.D.C. 2009) (finding plaintiff's administrative complaint of discrimination did not raise disparate impact claim because a "disparate impact claim is distinct from the disparate treatment claims [plaintiff] ha[d] alleged, and requires distinct elements of proof.").

Also, one cannot find that the discrete disparate impact claim is "reasonably related" to any of plaintiff's filed EEOC charges.  The D.C. Circuit has made clear that "for a charge to be regarded as 'reasonably related' to a filed charge . . . it must '[a]t a minimum . . . arise from the administrative investigation that can reasonably be expected to follow the charge of discrimination,'" as "[t]his connection is necessary to give the agency 'an opportunity to resolve [the] claim administratively before [the employee] file[s] her complaint in district court.'"  *Payne v. Salazar*, 619 F.3d 56, 65 (D.C. Cir. 2010), quoting *Park*, 71 F.3d at 907, and *Wiley v. Glassman*, 511 F.3d 151, 160 (D.C. Cir. 2007) (citation omitted); *see also Hopkins*, 630 F. Supp. 2d at 41

("The allegations in an administrative complaint must be sufficiently specific to give a federal agency the opportunity to handle the matter internally."). While the EEOC complaint alleges that plaintiff was underpaid for her position in relation to her Equal Pay Act claim, the allegations deal solely with plaintiff's individual situation. *See* Formal EEO Compl. at 00001–05 ("Ruppe notes that she did not receive any performance pay this past year, 2016 . . . Ruppe also notes that she is underpaid for her position and raised concerns that she is underpaid by up to $25,000 per year under State Department guidelines."). Unlike the amended complaint, which characterizes the defendant's policy of "including tenure in the lower grades as a basis for pay in higher positions" as disadvantageous to plaintiff *and* "women as a whole," Am. Compl. ¶¶ 180–81, there was no mention of employment practices that had an alleged disparate impact on women in the EEO complaint that would have notified the agency of the need to look into them.

Because plaintiff has failed to exhaust her disparate impact claim, the Court will grant defendant's motion for summary judgment with respect to Count IV.

## V.     Count V:  Retaliation for Prior Protected Activity in Violation of Title VII

Title VII's anti-retaliation provision makes it unlawful for "an employer [to] 'discriminat[e] against' an employee . . . because that individual 'opposed any practice' made unlawful by Title VII or 'made a charge, testified, assisted, or participated in' a Title VII proceeding or investigation." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56 (2006), quoting 42 U.S.C. § 2000e–3(a). The first clause, regarding employees who oppose a practice made unlawful by Title VII, is known as the opposition clause, while the second clause, regarding employees who participate in an EEO investigation, proceeding, or hearing, is known as the participation clause. *See Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 274 (2009).

In order to establish a prima facie case of retaliation, a plaintiff "must show:  (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between the two."  *Taylor v. Small*, 350 F.3d 1286, 1292 (D.C. Cir. 2003) (internal citation omitted).  The D.C. Circuit has explained that when a plaintiff is alleging retaliation in response to "protected activity," "[n]ot every complaint garners its author protection under Title VII. . . . While no 'magic words' are required, the complaint must in some way allege unlawful discrimination, not just frustrated ambition."  *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006) (internal citations omitted) (explaining that a memorandum that the plaintiff sent to her supervisors and the EEO office may not have met this standard because it "did not allege . . . that she was currently being discriminated against or that she was being retaliated against for her previous lawsuit").  "[A]n employee seeking the protection of the opposition clause must demonstrate a good faith, reasonable belief that the challenged practice violates Title VII."  *George*, 407 F.3d at 417 (internal brackets and citation omitted).

Plaintiff does not allege, nor does the undisputed evidence show, that she made a charge, testified, assisted, or participated in a Title VII proceeding or investigation *prior* to the alleged acts of retaliation.  *See* 42 U.S.C. § 2000e–3(a).[22]  But she does submit that the defendant retaliated against her on the basis of her sex for expressing opposition to a practice made unlawful by Title VII, arguing that she has "offered competent testimony that she repeatedly reported bullying based on gender, which constitutes protected activity under Title VII."  Pl.'s Opp. at 37.  Plaintiff points to her testimony that she reported to Townsend, Heffern, and Ziff, that a former deputy had

---

22    Plaintiff alleges that the alleged retaliation "took two concrete and economic forms":  the denial of the DCM positions and the denial of the performance award, both in 2016.  Am. Compl. ¶ 194.  She filed her formal EEO complaint on January 3, 2017.  Pl.'s SOF ¶ 23; Def.'s Resp. SOF ¶ 23.

"bullied females in her office," *id.* at 36, and the parties agree that plaintiff "sought advice" from the Ombudsman's Office regarding a "personnel issue," "anonymous 360s by unjustly biased people," and "perceived inappropriate treatment" by her subordinates.  Def.'s SOF ¶¶ 38–39; Pl.'s Resp. SOF ¶¶ 38–39.

While these reports aired what may have been legitimate workplace grievances, they do not constitute protected activity because these complaints did not contain allegations of discrimination or retaliation under Title VII.  *See Broderick*, 437 F.3d at 1232 (holding that complaints of mistreatment that were "embar[r]assing, humiliating and downright insulting" would not alone constitute protected activity); *see also Lewis v. D.C.*, 653 F. Supp. 2d 64, 79 n.10 (D.D.C. 2009) (finding that plaintiff's complaints of "mistreatment" did not qualify as protected activity).  Her communications with the Ombudsman's Office and the climate survey she subsequently conducted also do not contain any allegations of discrimination or retaliation under Title VII, but instead covered issues regarding the "vision" of the office, personnel issues, workload distribution, office communication, and "destructive behaviors" such as "malicious gossip."  Def.'s SOF ¶¶ 38–42; Pl.'s Resp. SOF ¶¶ 38–42.  The Court cannot find that raising these concerns – particularly since they were raised with the office that the parties have agreed has no EEO responsibilities – rose to the level of opposing discrimination in the workplace.  Therefore, plaintiff has not produced evidence to satisfy the first element of a prima facie case of retaliation.

Even if plaintiff had engaged in protected activity, she has not come forward with evidence to show that "the desire to retaliate was the but-for cause of the challenged employment action," *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013), which is the more stringent standard a plaintiff must satisfy to bring a Title VII retaliation claim.  *Id.*  This test "requires proof

that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.* at 360.

Plaintiff points to no direct evidence of retaliation, and the D.C. Circuit has made clear that in the absence of that evidence, "such claims are generally limited to conduct occurring shortly after the employee's protected activity." *Pueschel v. Chao*, 955 F.3d 163, 167 (D.C. Cir. 2020). Temporal proximity may support an inference of causation when the protected activity and the challenged action are close in time – generally, just a few months apart. *See Iyoha v. Architect of the Capitol*, 927 F.3d 561, 574 (D.C. Cir. 2019); *see also Hamilton*, 666 F.3d at 1349 (noting that "district courts in this circuit generally follow an informal 'three-month rule' for cases in which a plaintiff attempts to establish a prima facie case of retaliation based on temporal proximity alone.") (citation omitted).

Plaintiff's internal complaints began in February 2015, and she circulated the climate survey in July 2015. Def.'s SOF ¶¶ 38–41; Pl.'s Resp. SOF ¶¶ 38–41. The allegedly retaliatory conduct occurred the following year, as the denial of the DCM positions and the denial of the performance award both occurred in 2016. Def.'s SOF ¶¶ 26, 30, 53; Pl.'s Resp. SOF ¶¶ 26, 30, 53. Thus, there is an absence of the temporal proximity that could support a finding that retaliation was the but-for cause of the actions at issue. Moreover, there is no evidence in the record that her immediate supervisors – the ones who were aware of her concerns – played any role in the Committee's decisions regarding plaintiff's DCM bids or the Performance Pay Board's decision to deny her performance pay. *See, e.g.*, Def.'s SOF ¶¶ 28–29; Pl.'s Resp. SOF ¶¶ 28–29.

Because plaintiff has failed to establish a prima facie case of retaliation, the Court will grant summary judgment on Count V.

VI.      **Count VI:  Hostile Work Environment in Violation of Title VII**

Under Title VII, a hostile work environment exists when an employer subjects an employee

to "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to

alter the conditions of the victim's employment and create an abusive working environment."

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citation omitted).  To prevail on a hostile work

environment  claim,  a  plaintiff  must  show  that  the  workplace  was  "both  objectively  and

subjectively offensive," meaning that "a reasonable person would find [the workplace] hostile or

abusive, and one that the victim in fact did perceive to be so."  *Allen v. Napolitano*, 774 F. Supp.

2d 186, 205 (D.D.C. 2011), quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998).

To determine whether the objective standard has been met, the Court must consider the

"totality of the circumstances, including the frequency of the discriminatory conduct, its severity,

its offensiveness, and whether it interferes with an employee's work performance."  *Baloch v.

Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir 2008); *see also Allen*, 774 F. Supp. 2d at 205–06,

citing *Holbrook*, 196 F.3d at 262–63 (explaining that defendant's behavior must severely or

pervasively alter and interfere with plaintiff's employment).  "[C]onduct must be extreme to

amount to a change in the terms and conditions of employment" and create a hostile work

environment.  *Faragher*, 524 U.S. at 788.  "[O]ffhand comments, and isolated incidents (unless

extremely serious) will not amount to discriminatory changes in the terms and conditions of

employment." *Id.* (internal quotation marks omitted); *see also Harris*, 510 U.S. at 21 (the "'mere

utterance of an . . . epithet which engenders offensive feelings in a[n] employee' does not

sufficiently affect the conditions of employment to implicate Title VII."), quoting *Meritor Sav.

Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986).

Title VII hostile work environment claims may be based on either discrimination or retaliation.  *See, e.g.*, *Wise v. Ferriero*, 842 F. Supp. 2d 120, 125 (D.D.C. 2012).  Plaintiff alleges that the agency subjected her to a hostile work environment that was both discriminatory and retaliatory.  But her hostile work environment claim fails on either basis since she has not pointed to the kind of severe and pervasive wrongdoing that would have affected the terms and conditions of her workplace.

While plaintiff characterizes the agency's conduct as "abusive and discriminatory," Pl.'s Opp. at 39, she has failed to provide evidence that would enable a reasonable juror to find that her environment was objectively hostile.  She asserts that DAS Ziff's behavior toward her and the agency's dismissal of her complaints created a hostile work environment, but the evidence does not show that, under the totality of the circumstances, defendant's conduct was sufficiently severe and pervasive to interfere with her work performance.  Plaintiff points to evidence that DAS Ziff subjected her to "abusive, heightened scrutiny and discriminatory conduct" by repeatedly calling her "passive-aggressive" and a "micromanager."  *Id.*  She testified that DAS Ziff "told [her] to stop working, to go sit in [her] office and do nothing."  Ruppe Dep. at 168:9–11.  However, the record also reflects that plaintiff's female colleagues provided feedback suggesting that her human resource management could be improved upon.  Def.'s SOF ¶¶ 65–66; Pl.'s Resp. SOF 65–66. While Ziff's snide remarks and armchair psychology do not reflect well on his management skills, they are not sufficiently pervasive or severe to add up to a hostile work environment claim, and the evidence that he and others criticized some aspects of plaintiff's management style is not the stuff of an actionable claim.  *See Baloch*, 550 F.3d at 1201 (noting "legitimate reasons and constructive criticism offered in [ ] letters of counseling and reprimand" undercut allegations of a hostile work environment); *Brooks v. Grundmann*, 748 F.3d 1273, 1276–77 (D.C. Cir. 2014)

(Plaintiff's "performance reviews also do little to evince abusive conditions—they were not uniformly negative . . . Moreover, her reviews recommended areas of improvement—hardly the stuff of severe or pervasive workplace hostility.").

Plaintiff also points to several comments made by DAS Ziff and other officers in the Bureau as evidence of hostility based on gender.  Specifically, she testified that DAS Ziff asked her, "wouldn't you like to work in New York where your husband lives[,]" Ruppe Dep. at 105:10–22, and she cites an email in which Ziff discusses "human secretions" in response to a coworker's return from maternity leave.  Email from DAS Ziff, Ex. 49 to Def.'s Mot. [Dkt. # 69] [SEALED] at 1.  While plaintiff understandably takes umbrage at these inappropriate remarks, they do not constitute evidence of conduct that is severe or pervasive enough to support a hostile work environment claim.  *See Faragher*, 524 U.S. at 788 ("[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." (internal quotation marks and citation omitted)); *Baird v. Gotbaum*, 792 F.3d 166, 171 (D.C. Cir. 2015) ("[O]ccasional name-calling, rude emails, lost tempers and workplace disagreements—the kind of conduct courts frequently deem uncognizable under Title VII"); *George*, 407 F.3d at 416–17 (holding that occasions where colleagues repeatedly clashed with plaintiff and told her to shut up, that she shouldn't have been hired, and that she should "go back where she came from" were insufficiently severe or pervasive isolated incidents).  While plaintiff also points to testimony that some people in the Department used the term "bridesmaids" to refer to both men and women who were not promoted, and "meat markets" to refer to meetings to "deconflict personnel assignments," Def.'s SOF ¶¶ 60–61; Pl.'s Resp. SOF ¶¶ 60–61, those poor word choices do not add up to a hostile environment even if they should have

been long since discarded.  *See Brooks*, 748 F.3d at 1277–78 (noting that "tactless and ill-mannered" comments, "petty insults," and "vindictive behavior" are not enough to prove hostility).

While this behavior may have understandably offended plaintiff, the conditions she alleges – inappropriate remarks, commentary about her interpersonal skills, and dismissal of workplace complaints – do not reflect an environment that was objectively hostile.  Moreover, none of the conduct that plaintiff identified directly focused on her gender or her alleged protected activity.  *Cf. Baloch*, 550 F.3d at 1201 (affirming dismissal of plaintiff's hostile work environment claim in part because "none of the comments or actions directed at [plaintiff] expressly focused on his race, religion, age, or disability.").

Title VII hostile work environment standards are "demanding to ensure that Title VII does not become a general civility code."  *Faragher*, 524 U.S. at 788  (internal quotation marks and citation omitted).  In looking at the totality of plaintiff's alleged incidents, no reasonable juror could conclude that she was subjected to discrimination based on her sex or retaliation for her complaints that was so severe or pervasive that it created a hostile work environment that affected the terms and conditions of her employment.  The Court therefore finds that defendant is entitled to summary judgment on Count VI.

### VII.    Count VII:  Disability Discrimination in Violation of the Rehabilitation Act

In Count VII, plaintiff brings a claim for disability discrimination in violation of the Rehabilitation Act.  She alleges that Ziff perceived plaintiff as having "passive-aggressive disorder and paranoid personality disorder," and that he shared his comments with others in a manner that precluded her from securing a DCM position or receiving a cash award.  Am. Compl. ¶ 217–18.

The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability" may be discriminated against by a federal agency "solely by reason of her or his disability."

29 U.S.C. § 794(a).  The term "disability" is defined in the statute to include situations in which an individual (1) has a "physical or mental impairment that substantially limits one or more major life activities;" (2) has "a record of such an impairment;" or (3) has "been regarded as having such an impairment."   42 U.S.C.A. § 12102(1); *see* 29 U.S.C. § 705(20)(B).[23]   Similar to a discrimination claim under Title VII, the two "essential elements" of a discrimination claim under the Rehabilitation Act are that "(i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's . . . disability." *Baloch*, 550 F.3d at 1196 (citations omitted).

Plaintiff argues that Ziff "regarded her as having a disability," Pl.'s Opp. at 42, relying primarily on an admission in defendant's answer that Ziff "perceived Ruppe as mentally impaired," Answer ¶ 89 [Dkt. # 13], which the defendant now seeks to amend.  However, this change – and the issues pending before the Court in defendant's motion for leave to amend its answer – is ultimately immaterial, because even accepting the allegation in the complaint as a given, plaintiff has not satisfied the elements of a disability discrimination claim.

For the reasons discussed above with respect to Count I, plaintiff's non-selection for a DCM position was not an adverse action because she withdrew from the position, so that event cannot form the basis of a disability discrimination claim.  And as discussed with respect to Count II, the denial of a monetary award can constitute an adverse action, but plaintiff has failed to establish the necessary causal connection between the alleged perception or characterization of the

---

23      Plaintiff hangs her hat on the third prong of the definition, and she alleges that she was discriminated against because Ziff "perceived her to suffer" from a disability, specifically that he referred to her as "passive-aggressive" and "paranoid."  Am. Compl. ¶¶ 216–19.  Since the plaintiff's claim fails for several other reasons, the Court need not decide whether a layperson's casual use of psychological terms that have passed into common parlance and are frequently used in ordinary conversation is sufficient to satisfy the definition, but it has serious doubts that this is what Congress had in mind.

plaintiff on Ziff's part and the adverse action.  Plaintiff has not come forward with any evidence to show that Ziff used psychological terms in describing her to any of the relevant decision makers or that any of them were even aware that he referred to plaintiff in that manner.  In her opposition to the motion for summary judgment on this count, plaintiff does not point to any materials in the record that would establish the presence of genuine question for the jury as to whether she suffered an adverse employment action because of Ziff's supposed perception that she suffered from a disability, nor has she offered a valid argument for why this issue should be reserved for the jury.[24]

Because the Court has ruled in defendant's favor on this count on other grounds, it finds that the motion to amend that paragraph in the answer is moot.  A review of the redlined version of the proposed amended answer does not indicate any changes to Count III, the only surviving claim.  *See* Ex. A to Def.'s Mot. to Amend at 12.  The Court will therefore **DENY** defendant's motion for leave to amend as **MOOT**.

## CONCLUSION

For the foregoing reasons, the Court will **GRANT** defendant's motion for summary judgment with respect to Counts I, II, IV, V, VI, and VII, and **DENY** defendant's motion with respect to Count III.  Plaintiff's cross-motion for summary judgment as to Count III will be **DENIED**, and this claim will be **TRANSFERRED** to the United States Court of Federal Claims.  Defendant's motion for leave to amend is **DENIED** as **MOOT**.  A separate order will issue.

---

24      In her opposition to defendant's motion for summary judgment, plaintiff argues that "a determination of this kind of causation is normally a question of fact for the jury."  Pl.'s Opp. at 45, citing *Payne v. District of Columbia*, 741 F. Supp. 2d 196, 219 (D.D.C. 2010).  But that non-binding decision – and its relevant discussion of causation – is inapposite here, as *Payne* involved a First Amendment retaliation claim and specifically noted that such claims carry a higher standard for establishing the causation factor.  *See id.*

AMY BERMAN JACKSON
United States District Judge

DATE:  July 3, 2024